United States District Court
Eastern District of Michigan

United States of America,

                              No. 19-cr-20836

v.

                              Hon. Mark A. Goldsmith

Richard Sollars,

        Defendant.

---

## Government's Response in Opposition to Defendant's Motion to Suppress Evidence

The FBI obtained two judicially approved search warrants during their bribery investigation of then-Mayor of the City of Taylor, defendant Richard Sollars. The first warrant was directed to Apple ("Apple Warrant") and authorized a search of Sollars's iCloud account. The second warrant, which FBI obtained several months later, authorized law enforcement to search Sollars's Taylor, Michigan residence ("Residence Warrant").

The affidavit in support of the Apple Warrant ("Apple Affidavit") was based on corroborated information from a cooperating witness and two cooperating human sources who also were reliable. This totality of this information demonstrated the substantial likelihood that Sollars was corruptly accepting things of value such as cash, home renovations, and airfare from individuals who had business before the City of Taylor. The affidavit also established that Sollars

1

communicated with other individuals involved in the bribery scheme using an

encrypted messaging application, WhatsApp, to conceal his communications about

gifts, home renovations, and other things of value. Sollars used WhatsApp on his

Apple iPhone which is why there was probable cause that those communications

and other related information would be found in his Apple iCloud account. And the

Apple Warrant was sufficiently particularized as to how law enforcement may

search and what they may seize—namely, evidence relating to the elements of

bribery and money laundering.

The Residence Warrant also was supported by probable cause based on

much of the same information that was included in the Apple Affidavit as well as

Sollars's text and WhatsApp messages derived from the Apple Warrant. But even

without these iCloud communications, as with the Apple Warrant, the Magistrate

Judge had a substantial basis to find probable cause based on the totality of the

information presented in the affidavit in support of the Residence Warrant

("Residence Warrant").

Regardless, given the FBI's good faith execution of both warrants, the

exclusionary rule does not apply. The defendant's motion should be denied.

## BACKGROUND

### I.    FBI obtains a search warrant for Sollars's Apple iCloud account.

On September 20, 2018, Magistrate Judge Anthony Patti issued the Apple Warrant, authorizing the search of Sollars's iCloud account. (Gov. Ex. 1: Apple Warrant, filed under seal). The accompanying affidavit described Sollars's long history as a public official. (*Id.* at ¶ 8). Sollars was serving his second term as Mayor of the City of Taylor and prior to that had served two terms as a member of the Taylor City Council. (*Id.*). During Sollars's time as Mayor, he had developed a close relationship with Shady Awad, a local real estate developer and the owner of Realty Transition LLC. Realty Transition had been awarded contracts from the City to rehabilitate and develop houses since at least 2015—all while Sollars was the Mayor. (*Id.* at ¶¶ 10-11).

Awad's and Sollars's relationship was not limited to a businessman conducting business with the City. Rather, a former Realty Transition employee, identified as cooperating witness (CW), told the FBI in April 2018 that Awad paid for or partially paid for a condo and vacation home for Sollars and provided new flooring and other renovations for Sollars's home in exchange for winning contracts from the City. (*Id.* at ¶ 14). The CW also explained that Awad and Sollars had traveled to Las Vegas multiple times together, including a trip to gamble during the 2018 Super Bowl. (*Id.* at ¶ 15). Another informant (CHS-1),

3

who had previously provided reliable information to the FBI, confirmed that Awad and Sollars had gone to Vegas together during that same timeframe. (*Id.* at ¶ 16). Flight records also established that Paul Phillips, the president of a hardwood flooring company, had joined them on that trip. (*Id.* at ¶ 20).

Records from the Caesars Palace Casino in Las Vegas confirmed that Sollars had traveled to Las Vegas during that time and that his gambling activity there involved tens of thousands of dollars. (*Id.* at ¶ 17). A series of Currency Transaction Reports (CTRs) filed by the casino showed that his gambling activity consisted of over $50,000 of "bills inserted into gaming device" from February 2 through February 5, 2018.[1] (*Id.*). Each day that Sollars was there, his gambling activity involved more than $10,000, all while he only earned a government salary. (*Id.*).

A second informant (CHS-2), whose previous reporting had been corroborated by consensually monitored Title III's and who had paid multiple controlled bribes to public officials, provided information about previous bribes

---

[1] The government disputes Sollars's lengthy footnote 1 (ECF No. 96, PageID.569) interpreting "bill inserted into gaming device" by suggesting that casinos essentially double count a gambler's actual insertion of cash. Whether or not the over $50,000 was cash out of Sollars's pocket, Sollars was gambling in amounts inconsistent with someone earning a government salary. Regardless, when determining whether an affidavit establishes probable cause, reviewing courts look only to the four corners of the affidavit. *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016).

paid to Sollars and gave important context to Sollars's and Awad's travel to Las Vegas in February 2018. (*Id.* at ¶ 21)[2]. CHS-2 described how in 2013 or 2014, he gave $5,000 to Sollars and Sollars' Chief of Staff, Robert Dickerson, (who were both public officials) at their request while at the MGM Casino in Detroit. (*Id.*). At the time, CHS-2 worked for Gasper Fiore, the owner of a towing company and a concrete company who had been convicted of federal bribery conspiracy. (*Id.*).

In a 2018 proffer interview, Fiore denied that he had a *quid pro quo* business relationship with Sollars. (*Id.* at ¶ 25). But the FBI's investigation suggested that Fiore's denials were untrue and instead corroborated that Sollars accepted benefits from Fiore, who was then doing business with the City. Airline records revealed that Fiore's company paid for flights to Las Vegas for Sollars, Fiore, and Fiore's employee, Philip Sakalian, for travel in March 2017. (*Id.* at ¶ 26). Although Fiore's ticket was cancelled at the last minute, Sakalian and Sollars flew to Las Vegas together from March 7 through March 10, 2017. (*Id.* at ¶ 27). Their trip was confirmed by CTRs filed by the Wynn Casino showing Sollars's gambling activity consisting of $18,040 of "bills inserted into gaming device" in one single day. (*Id.* at ¶ 28). Shortly after this trip to Las Vegas, the City awarded Fiore's company a

---

[2] Paragraph 21 of Defendant's Exhibit A (the Apple Warrant) was redacted. The government previously produced this affidavit to the defense with this paragraph redacted in order to protect the identity of CHS-2 who was still actively working with the FBI. Government's Exhibit 1 is the Apple Warrant with Paragraph 21 unredacted, as it was reviewed by Magistrate Judge Patti.

concrete repair contract worth $114,000. (*Id.* at ¶ 29). The investigation revealed that this was just one of a series of contracts that the City had awarded to Fiore's company both before and after the March 2017 Las Vegas trip provided to Sollars. (*Id.*).

The Apple Affidavit established that Sollars—a public official—had a history of receiving cash and airline tickets from a company that had lucrative contracts from the City. Additionally, the affidavit set forth that Sollars similarly was receiving things of value from and traveling to Las Vegas with Shady Awad, who was also doing business with the City. Based on this information, the FBI began investigating how Sollars, Sollars's Chief of Staff, and Awad were communicating. (*Id.* at ¶ 30).

What they found was that Sollars and his Chief of Staff had minimal contact with Awad via traditional telephone calls or text messages. (*Id.* at ¶ 31). So the FBI began obtaining real-time incoming and outgoing WhatsApp tolls, which the agent, who investigates public corruption crimes, described as a method of communications for "conceal[ing] the nature of those communications [between public officials and individuals doing business before them] from scrutiny by law enforcement and the public." (*Id.* at ¶¶ 2, 33). The WhatsApp information was revealing. While Sollars communicated minimally with Awad (the person suspected of giving him bribes and kickbacks) using traditional methods, Sollars

exchanged 665 messages with Awad using WhatsApp in the two-month period between July and September 2018. (*Id.* at ¶ 32). Dickerson, Sollars's Chief of Staff and someone who had demanded things of value from Awad in the past, exchanged 517 WhatsApp messages with Awad. (*Id.* at ¶¶ 21, 32). Fourteen of the messages between Awad and Dickerson also included Paul Phillips (the owner of a flooring company). This was revealing since new flooring was one of the items of value that CW said Sollars received from Awad. (*Id.* at ¶¶ 20, 32). Tellingly, Sollars and his Chief of Staff only exchanged 9 WhatsApp communications. (*Id.* at ¶ 32).

Information obtained from WhatsApp specified that Sollars was using iPhones to send and receive these communications. (*Id.* at ¶ 36). A user's Apple iCloud account would likely store data from that user's WhatsApp account, as well as data from related services such as email accounts and other instant messaging platforms. (*Id.* at ¶¶ 38, 39, 44). Based on his training and experience, the agent stated that iCloud data could provide valuable evidence as to the nature, means, and details of the criminal conduct alleged, including Sollars's state of mind. (*Id.* at ¶¶ 44-50).

The Apple Warrant yielded a treasure trove of evidence that Sollars was accepting bribes and kickbacks from Awad and others who were doing business with the City. Sollars's iCloud data contained call logs, photographs and messages

(text, MMS, iMessages, and WhatsApp) that related to Sollars solicitation and receipt of cash, gifts, home renovations and other things of value from Awad and others who were doing business with the City. The communications also provided evidence of Sollars's control over the City's contracts for tax-foreclosed homes and how his decisions were influenced by whether he was happy with Awad or not.

## II.   FBI obtains a search warrant for Sollars's home.

On February 15, 2019, Magistrate Judge Anthony Patti issued the Residence Warrant, authorizing law enforcement to search Sollars's home in Taylor, Michigan. (Gov. Ex. 2: Residence Warrant, filed under seal). The Residence Affidavit provided the same background information as the Apple Affidavit regarding Sollars's status as the Mayor of City of Taylor, and who Robert Dickerson and Shady Awad were. (*Id.* at ¶¶ 4-6). The Residence Affidavit described how Awad's company, Realty Transition, annually had been awarded contracts from the City for tax-foreclosed homes since at least 2015. (*Id.* at ¶ 23). And CHS-1, an individual who had access and placement within the City Council, told the FBI that it was Sollars who decided which company would be awarded the contracts from the City. (*Id.* at ¶ 26). CHS-1 specifically recounted that in 2015, the year the Realty Transition began doing business with the City, Sollars directed the City Council to award the contract to Realty Transition. (*Id.*).

The Residence Affidavit included the same information provided by CW regarding the things of value Sollars was receiving from Awad in exchange for the City contracts and about their travel to Las Vegas in February 2018. (*Id.* at ¶¶ 27, 35). The Residence Affidavit contrasted Sollars's gambling activity that weekend, a total of $50,240 of bills inserted into gaming devices, with Sollars's annual City salary ranging from a low of $65,783 to a high of $77,193 between 2014 and 2017. (*Id.* at ¶¶ 36-37). The affidavit also included similar information about how and why certain individuals in Sollars's position use WhatsApp and how WhatsApp tolls "revealed a consistent pattern of communications" between Sollars, Dickerson, and Awad. (*Id.* at ¶¶ 39-40).

The affidavit set forth communications derived from the Apple Warrant relating to things of value that Sollars accepted from Awad and other individuals doing business with the City. (*Id.* at ¶¶ 46-47, 50 [humidor]; 52-59 [home and lake house renovations]; 60-64 [bribes from Sakalian]).

The agent also provided information from CHS-2 about the humidor that was not a fruit of the Apple Warrant. (*Id.* at ¶¶ 48-49, 51) [3]. Specifically, CHS-2

---

[3] Paragraphs 48-49 and 51 of Defendant's Exhibit B (the Residence Warrant) was redacted. As with the Apple Affidavit, the government produced this affidavit to the defense with these paragraphs redacted in order to protect the identity of CHS-2 who was still actively working with the FBI. Government's Exhibit 2 is the Residence Warrant with these paragraphs unredacted, as it was reviewed by Magistrate Judge Patti.

was in Sollars's office on December 13, 2018 while wearing video recording equipment that captured images of a humidor. (*Id.* at ¶ 48). During a meeting with Dickerson that day, CHS-2 expressed his desire to obtain one of the City's marijuana licenses. (*Id.* at ¶ 49). Immediately thereafter, Dickerson told CHS-2 what type of cigars Sollars liked and suggested that CHS-2 purchase cigars for Sollars, suggesting that CHS-2 would receive favorable treatment from Sollars. (*Id.* at ¶¶ 49, 50).

Finally, the agent included the same information from the Apple Warrant regarding the $5,000 CHS-2 (Fiore's employee) gave to Sollars and Dickerson at MGM Casino in Detroit and about Sollars's trip to Las Vegas paid for by Fiore's company that was doing business with the City. (*Id.* at ¶¶ 64, 69-70).

## ARGUMENT

### I.   The Apple Warrant was supported by probable cause.

Well-settled law provides that probable cause should be evaluated based on the totality of facts and inferences presented. The Apple Warrant was supported by information from reliable individuals who were known to the FBI. Their information was also corroborated by independent investigation. A common-sense review of the Apple Affidavit based on the totality of the information shows that the Magistrate Judge had a substantial basis to find probable cause to issue the Apple Warrant.

## A.    Applicable Law

A warrant is supported by probable cause when "given all of the circumstances set forth in [an] affidavit. . .there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc). An affidavit to support a search warrant must also establish a connection between the criminal conduct and the item or place to be searched. *Id.* at 313.

Probable cause is a "practical, nontechnical conception" based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 231. It is a "common-sense decision, based on the totality of the circumstances, not line-by-line scrutiny of the affidavit." *United States v. Brown*, 857 F.3d 334, 339 (6th Cir. 2017). "[A] divide-and-conquer approach is improper," because "[a] factor viewed in isolation is often more 'readily susceptible to an innocent explanation' than one viewed as part of a totality." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *United States v. Arviszu*, 534 U.S. 266, 274 (2002)). And an affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or on what a

critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

Once a magistrate has determined the existence of probable cause, that decision should only be reversed if it was arbitrarily made. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). A reviewing court must accord "great deference" to the issuing judge's determination and should not undertake *de novo* review. *Allen*, 211 F.3d at 973 (citing *Gates*, 462 U.S. at 236). "[S]o long as the magistrate had a "substantial basis for . . . concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* (internal brackets and quotation marks omitted). Accordingly, the Supreme Court has directed that "courts should not invalidate [a] warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." *United States v. Ventresca*, 380 U.S. 102, 109 (1965).

### B.   Discussion

Magistrate Judge Patti had a substantial basis to find that the Apple Affidavit established probable cause based on statements from a cooperating witness (CW), two confidential human sources (CHS-1 and CHS-2), independent investigation by the FBI, and the training and experience of the affiant including information learned from other agents. The CW, a former employee of Realty Transition, told the FBI that Awad was providing things of value to Sollars so that Awad would

12

win the contracts for the City's tax-foreclosed homes. (Gov. Ex. 1: Apple Warrant, at ¶ 14, filed under seal). The CW also explained that Awad and Sollars frequently travelled to Las Vegas to gamble and that they were there during the 2018 Super Bowl. (*Id.* at ¶ 15).

When an affidavit includes statements from an informant or confidential source known to investigators but not named in the affidavit, probable cause for the warrant depends on whether the reliability of the information or sufficient independent corroboration of the informant's statements can be found within the four corners of the affidavit. *United States v. Woosley*, 361 F.3d 924, 926-27 (6th Cir. 2004). An informant that is known to police is "generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." *United States v. Hodge*, 714 F.3d 380, 385 (6th Cir. 2013); *see also United States v. Kinison*, 710 F.3d 678, 682 (6th Cir. 2013) ("a known informant's statement can support probable cause even though the affidavit fails to provide any additional basis for the known informant's credibility and the informant has never provided information to the police in the past."). Facts supporting an informant's reliability "need not take any particular form." *United States v. Jackson*, 470 F.3d 299, 307 (6th Cir. 2006) (citing *Allen*, 211 F.3d at 975-76). "The affidavit could state that police corroborated significant parts of the informant's story. Or the affiant could

attest 'with some detail' that the informant provided reliable information in the past. . . . . Or there could be other indicia of reliability, such as . . . . the willingness of the informant to reveal his or her name." *Id.*; *see also United States v. May*, 399 F.3d 817, 824 (6th Cir. 2005) (finding there is no requirement that an informant be named to the magistrate for the magistrate to rely on his or her statements).

The Apple Affidavit presented several indicia of the CW's reliability. First, CW was not an anonymous tipster, but rather, someone known to the FBI. CW, a former employee of Realty Transition, was a private citizen who volunteered information to the FBI and had no apparent motive to lie. CW also was inherently reliable because he or she risked arrest for making a false statement to the FBI. *United States v. Couch*, 367 F.3d 557, 560-61 (6th Cir. 2004); *see also United States v. Fooladi*, 703 F.2d 180, 183 (5th Cir. 1983) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case."). Also, as an employee of Realty Transition, CW had a basis of knowledge for the information he or she provided.

In addition to the indicia of CW's reliability, the FBI "corroborated significant parts" of CW's story. *Jackson*, 470 F.3d at 307. As CW reported, Awad was the owner of Realty Transition during the time that Sollars was Mayor of the City of Taylor. (Gov. Ex. 1: Apple Warrant, at ¶¶ 8, 10, filed under seal). Agents

14

confirmed that Awad and Realty Transition had been awarded contracts for tax-foreclosed homes on an annual basis since at least 2015 from the City of Taylor. (*Id.*, at ¶¶ 11-13). This showed that Awad had a financial stake in making Sollars happy, lending credibility to CW's information regarding the pay-to-play scheme.

While Awad had this business relationship with the City, he frequently travelled to Las Vegas to gamble with Sollars, including a trip during the 2018 Super Bowl. (*Id.* at ¶ 15). And the FBI corroborated this trip with information from CHS-1 who had a track record of providing reliable information to the FBI. (*Id.* at ¶ 16). Agents also obtained Currency Transaction Reports from Caesars Palace Casino in Las Vegas showing Sollars gambled there before and after the February 4, 2018 Super Bowl. (*Id.* at ¶ 17). Airlines records further showed that Awad travelled to Las Vegas from February 1 to February 5, 2018, along with Paul Phillips. (*Id.* at ¶ 20). The FBI determined that Phillips was the president of a hardwood flooring company, which provided context and corroboration for CW's information that Awad provided new flooring for Sollars. (*Id.* at ¶¶ 14, 20). This seemingly close and personal nature of Awad's and Sollars's relationship also lent credibility to the CW's information that they were not doing business at arm's length. (*Id.* at ¶14).While it may not be a crime for the ordinary person to go to Sin City, it becomes part of the probable cause calculus when the public official in charge of a city, travels to Las Vegas to gamble tens of thousands of dollars, all

15

while making a government salary, with individuals who have a financial stake in their relationship.

Sollars's travel to Las Vegas with Awad must also be viewed in conjunction with his history of receiving things of value, relating to casino gambling and Las Vegas travel, from individuals who wanted to maintain and win contracts from the City. The Apple Affidavit included information provided by CHS-2, who had a track record of reliability. (*Id.* at ¶ 21). CHS-2 recounted that several years prior, he had given $5,000 to Sollars and Sollars's Chief of Staff at their request while they were at the MGM Casino in Detroit. (*Id.*). This happened at a time when CHS-2 was employed by convicted bribe-payer Gasper Fiore, the owner of a company who was then doing business with the City. (*Id.* at ¶¶ 21, 29). The FBI's investigation also revealed that Fiore's company paid for Sollars's travel to Las Vegas with Fiore and one of Fiore's employees. (*Id.* at ¶ 26). Shortly after that trip, Fiore's company was awarded a $114,000 concrete repair contract from the City. (*Id.* at ¶ 29). Based on the totality of these circumstances, Sollars's travel to Las Vegas with Awad and other businessmen provided incriminating facts and common-sense inferences to be considered in the Magistrate's probable cause determination.

Sollars's pattern and method of communications also corroborated CW's information regarding the corrupt nature of Sollars's and Awad's business

relationship. Common sense would dictate that a public official, such as Sollars, would use their cell phones to engage in legitimate City business, especially with someone like Awad who had regular contracts with the City since 2015. But not so with Sollars. Traditional telephone tolls showed that Sollars and Awad very minimal contact. (*Id.* at ¶ 31). Instead, Sollars communicated with Awad using WhatsApp, an encrypted messaging platform that does not retain toll records. (*Id.* at ¶¶ 32, 34). And Sollars communicated with Awad a lot. He exchanged 665 encrypted WhatsApp messages with Awad in a short two month period. (*Id.* at ¶ 32). Sollars's Chief of Staff, who previously demanded money from CHS-2 for he and Sollars, exchanged 517 WhatsApp messages with Awad. (*Id.*). Tellingly, Sollars only exchanged nine WhatsApp messages in two months with his own Chief of Staff which leads to a reasonable inference that Sollars used WhatsApp when he wanted to hide his communications and the nature of his relationships with certain people like Awad. While it may be true that billions of people use WhatsApp, the Apple Affidavit showed that Sollars likely did not use WhatsApp for every day, above-board communications.

In addition to common-sense inferences, the affiant also learned from his training and experience that public officials who want to conceal their communications with potential bribe payers would likely use an encrypted messaging application like WhatsApp. (*Id.* at ¶ 33). The affiant had almost a year's

experience investigating public corruption crimes, four years on the staff of a public official, and also relied on information from other agents. (*Id.* at ¶¶ 3, 6). Law enforcement agents are certainly entitled to use their training and experience derived from analogous cases and fellow agents, as well as their common sense, in making these assessments.

The affidavit also established that Sollars used his Apple iPhone in furtherance of the bribery scheme and that evidence would be found in the data stored within his related Apple iCloud account. The pen register data from WhatsApp showed that Sollars was using an iPhone to send and receive messages. (*Id.* at ¶ 36). The iPhone's capabilities are many and often stores data in a user's iCloud account that could provide valuable clues as to the "who, what, why, when, where, and how" of crimes such as bribery and money laundering. (*Id.* at ¶ 45). Users can use iPhones to send and receive messages that attach photos, videos, files, and documents and to back up a variety of data. (*Id.* at ¶¶ 39, 44). Apple retains information about who used the iPhone, which would provide relevant user-attribution evidence. Apple also provides iCloud storage space that could be used to store device backups and data associated with third-party messaging apps like WhatsApp. (*Id.* at ¶ 44). This data could provide evidence of bribery and money laundering such as the identification of other individuals who may be involved, Sollars's intent and plan to demand and receive things of value, more detail

regarding the relationship between Sollars and individuals doing business with the City, and more.

The Apple Affidavit when viewed as a whole provided a series of facts and inferences that carry with it the degree of suspicion required to establish probable cause that Sollars was accepting bribes and kickbacks from Awad and other individuals doing business with the City. *See Gates*, 461 U.S. at 245 n. 13 ("the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts") (citations omitted). This Court should reject defendant's invitation to analyze in a "hypertechnical" manner whether each piece of information, devoid of context, is sufficient to support probable cause. *Ventresca*, 380 U.S. at 109. Magistrate Judge Patti had a substantial basis to find probable cause to search Sollars's Apple iCloud account. And the Magistrate's totality-of-the-circumstances assessment of probable cause is entitled to substantial deference. The Apple Warrant should be upheld.

## II.   The Apple Warrant was not overbroad.

### A.   Applicable Law

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend IV. The particularity requirement prevents general searches by requiring a neutral

19

judicial officer to confine the scope of the search to areas where there is probable cause to believe that evidence of a crime will be found. *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 441 (6th Cir. 2006).

The Sixth Circuit has determined that the particularity requirement encompasses two things: (1) does the warrant give the agents enough information to guide their judgment on what to take; and (2) is the list of items to be seized "overbroad" in that it includes items that should not be seized. *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011). A warrant is sufficiently particular "if its text constrains the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018).

**B.     Discussion**

**1.     The scope of the seizure and search of the Apple Warrant was sufficiently limited.**

While the face sheet of the Apple Warrant lists a number of crimes, the affidavit and the "Attachment B"—which guides what law enforcement may seize—actually limited the search to only two crimes: theft or bribery concerning programs receiving federal funds, in violation of 18 U.S.C.§ 666; and laundering of monetary instruments, in violation of 18 U.S.C. § 1956. (Gov. Ex. 1: Apple Warrant, at ¶ 4 and Part II, Attachment B, filed under seal). Accordingly, the Apple Warrant was sufficiently particular because the Attachment B limited and guided

20

the discretion of agents to only search for evidence of two specific crimes. *Castro*, 881 F.3d at 961; *see also United States v. Willoughby*, 742 F.3d 229, 233 (6th Cir. 2014) (global modifier specifying crimes for which there was probable cause sufficiently limited agent's judgment as to where to search and what to seize).

Nor was the warrant deficient in authorizing the search of Sollars's entire iCloud account. The Sixth Circuit has repeatedly approved the seizure of entire storage medium and has "rejected most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers," *Richards*, 659 F.3d at 539 (6th Cir. 2011), because "criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity [such that] a broad, expansive search of the [computer] may be required." *Id*. at 538 (quoting *United States v. Stabile*, 633 F.3d 219, 237 (3d Cir. 2011)).

In *Richards*, the Sixth Circuit upheld a warrant authorizing a search of the entire server for evidence of child pornography, even though probable cause for the search was limited to one specific website, because officers did not know how or where that information would be stored on the server. The Sixth Circuit has recognized that practically, law enforcement may need to look everywhere on a computer or server to find evidence of a crime. The *Richards* court noted that "in general, [s]o long as the computer search is limited to a search for evidence explicitly authorized in the warrant, it is reasonable for the executing officers to

21

open the various types of files located in the computer's hard drive in order to determine whether they contain such evidence." *Id.* at 540 (internal quotation marks and citation omitted); *see also United States v. Evers*, 669 F.3d 645, 653-54 (6th Cir. 2012) (rejecting overbreadth challenge to search of server based on topics); *United States v. Bass,* 785 F.3d 1043, 1049–50 (6th Cir. 2015) (rejecting overbreadth challenge to warrant for search of entire cell phone).

The search of a cloud-based storage account is in practice, no different than the search of a computer hard drive or phone. The only distinction is an additional first step of the service provider copying the account data from the server that it is stored on and providing the government that copy. In fact, by its nature, the search of a cloud-based account is actually more limited in scope than the typical search of a computer of phone. Rather than looking through unrelated or personal files and folders that maybe on a phone or a computer, access to the cloud-based account is limited on the front end to only those associated with a particular account, not everything contained on the server or in files on the computer. Courts that have considered the issue have routinely held that a search of the entire account is permissible. *See, e.g.*, *In the Matter of a Warrant for All Content and Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc*., 33 F. Supp. 3d 386, 394 (S.D.N.Y. 2014), as amended (Aug. 7, 2014) ("every case of which we are aware that has entertained a

suppression motion relating to the search of an email account has upheld the

Government's ability to obtain the entire contents of the email account to determine

which particular emails come within the search warrant." *Id.*at 394 (collecting

cases).

The Apple Warrant also followed Federal Rule of Criminal Procedure

41(e)(2)(B)'s two-step approach to warrants for electronic evidence. This rule

provides that electronically stored evidence may be seized in its entirety, with a

review of the evidence to occur at a later time and place. The Advisory Committee

Notes explain that "officers may seize or copy the entire storage medium and

review it later to determine what electronically stored information falls within the

scope of the warrant." Fed. R. Crim. P. 41, Advisory Committee's Notes (2009

amend.). The Notes recognize that electronic storage media "commonly contain

such large amounts of information that it is often impractical for law enforcement

to review all of the information during execution of the warrant at the search

location." *Id*. And the Sixth Circuit has approved the two-step procedure for

executing warrants for electronic evidence. "The federal courts are in agreement

that a warrant authorizing the seizure of a defendant's home computer equipment

and digital media for a subsequent off-site electronic search is not unreasonable or

overbroad, as long as the probable cause showing in the warrant application and

affidavit demonstrate a 'sufficient chance of finding some needles in the computer

23

haystack.'" *Evers*, 669 F.3d at 652 (quoting *United States v. Upham*, 168 F.3d. 532, 535 (1st Cir. 1999)).

Consistent with that two-step process, warrants for e-mail and cloud accounts require production of the entire contents of the account, pursuant to Attachment A and Part I of Attachment B. The providers are not required, nor would they be able, to conduct their own search of the account or parse out sections of the account. For that reason, Attachment B of the Apple Warrant is divided into two parts: Part I describes the information to be produced; and Part II describes the items that the government can search for and seize from the account. And Sollars does not point to a single case, controlling or otherwise, which found that the approach utilized here—searching a cloud-based account for specific targeted offenses based on probable cause—was overbroad or improper. Indeed, in the two cases he cited from the Sixth Circuit (*Richards* and *Evers*), which challenged searches of an entire computer or computer server, the Court found the two-step procedure proper and the warrants not overbroad.

### 2.   The Apple Warrant was not required to have a temporal restriction.

The Sixth Circuit has repeatedly held that warrants can be sufficiently particular by describing a specific type of subject matter, even if there is no time limit. *United States v. Ford*, 184 F.3d 566, 578 (6th Cir. 1999). In *Ford*, the Sixth

Circuit found that the "subject-matter limitation (fruits and evidence of gambling) fulfill[ed] the same function as a time limitation would have done, by limiting the warrant to evidence of the crimes described in the affidavit." *Id.* Additionally, the Sixth Circuit has held that a warrant limited to the time period when criminal activity took place was sufficiently particular to target the evidence that was the subject of the government's investigation. *United States v. Hanna,* 661 F.3d 271, 287 (6th Cir. 2011). Indeed, other federal courts have also upheld email warrants without date restrictions. *See, e.g.*, *United States v. McDarrah*, 2006 WL 1997638, at *2, 9-10 (S.D.N.Y. July 17, 2006), aff'd 351 F. App'x 558, 561 (2nd Cir. 2009) (summary order) (search not overbroad, where warrant authorized search of "[a]ll stored electronic mail and other stored content information presently contained in, or on behalf of" a targeted email account); *United States v. Deppish,* 994 F.Supp.2d 1211, 1220 (D. Kan. Jan. 31, 2014) (rejecting motion to suppress email warrant that included no temporal limitation).

Here, a common-sense reading of the affidavit makes clear that there are subject-matter limitations that focus the search to the targeted crimes—bribery and money laundering—for a time period relevant to the investigation. The Apple Affidavit identified that Sollars was serving his second term as mayor of Taylor, Michigan (Gov. Ex. 1: Apple Warrant, at ¶ 8, filed under seal) and that Robert Dickerson was his chief of staff. (*Id.* at ¶ 9). It also provided that Awad was the

25

owner of Reality Transition LLC, and that since 2015, his company had annually been awarded contracts with City to acquire, rehabilitate, and sell tax foreclosed homes in the city. (*Id*. at ¶¶ 10-13).

In April of 2018, CW told the FBI about an illegal "pay to play, *quid pro quo* scheme" that existed between Sollars and Awad. Specifically, CW stated that in exchange for Awad doing work for Sollars' properties, Awad would receive contracts from the city to rehabilitate tax-foreclosed homes. (*Id*. at ¶ 14). The affidavit also indicated that as of September of 2018, hundreds of encrypted text messages had been exchanged between Sollars, Awad, and Dickerson, while Sollars and Dickerson exchanged only nine messages using the encrypted messaging service. (*Id*. at ¶ 32). A common-sense reading of the affidavit shows that the investigation was focused on the alleged pay-to-play scheme that started around 2015 when Awad was awarded contracts with Taylor. In any event, the time span here is less than the seven-year span upheld in another case that involved a multi-year fraud conspiracy. *In re Search of 14 Email Addresses Controlled by Google, LLC*, 438 F. Supp. 3d 771, 776-77 (E.D. Mich. 2020).

Even if Sollars' argument had merit, the remedy is not suppression. An "infirmity due to overbreadth does not doom the entire warrant." *Castro*, 881 F.3d at 965 (quoting *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001). According to the Sixth Circuit, "the remedy for an overbroad warrant is to suppress

the evidence taken specifically under the overbroad search term." *United States v. Carter*, 792 F. App'x 366, 369 (6th Cir. 2019) (citing *Richards*, 659 F.3d at 527); *see also United States v. Chandler*, 571 F. Supp. 3d 836, 844 (E.D. Mich. 2021) (citing *Castro*, 881 F.3d at 965) (holding that the remedy to overbreadth would be "to sever the offending phrase from the warrant, suppress any evidence collected under it, and admit the evidence collected under the valid portions that remain."). Sollars fails to identify any particular piece of evidence here.

### III.   The Residence Warrant was supported by probable cause.

The Residence Affidavit was based on largely the same information that was included in the Apple Affidavit. This was information from reliable individuals who were known to the FBI and that was corroborated by the FBI's investigation. The Residence Affidavit, however, also included Sollars's text messages related to bribery and money laundering that were obtained from the search of his Apple iCloud account. Together, there was more than a substantial basis for Magistrate's probable cause finding. But even without the text messages, the remaining information in the Residence Affidavit established probable cause.

Like the Apple Affidavit, the Residence Affidavit described Sollars's history as a public official and Awad's business relationship with Sollars's city. (Gov. Ex. 2: Residence Warrant at ¶¶ 4, 6, filed under seal). The Residence Warrant, however, included additional information from CHS-1 that Sollars controlled who

received the City's contracts for tax-foreclosed properties. (*Id.* at ¶ 26). CHS-1, who was described as having "access and placement" to the business of the City Council, cited an example from 2015 when Sollars specifically directed the Council to award the contract to Awad's company. (*Id.*). This was the year that Realty Transition began winning the contracts for the City's tax-foreclosed properties. (*Id.* at ¶ 23).

The Residence Affidavit included the same information provided by CW regarding Awad's bribe payments to Sollars, their frequent Vegas trips, and how the FBI corroborated their 2018 travel to Las Vegas with flight records and CTRs. (*Id.* at ¶¶ 27, 35-36). This time, however, the agent provided facts that gave the CTRs more meaning related to the probable cause calculus than just corroboration of Sollars's travel to Las Vegas with Awad. The agent described how State of Michigan income tax records showed that Sollars's salary as Mayor ranged from $65,783 to $77,193 from 2014 through 2017. (*Id.* at ¶ 37). This stood in stark contrast to the over $50,000 of "bills inserted into gaming device" over just three days of Sollars's gambling activity during the 2018 trip with Awad, and the $18,040 during a single day of gambling during Sollars's trip with Sakalian in 2017. (*Id.* at ¶¶ 36, 61). Regardless of whether this was money straight from Sollars's pocket or not, the fact that the volume of Sollars's gambling activity over three days consisted of an amount totaling more than half of his yearly salary

28

became a piece of information that was part of the totality of the circumstances presented in the affidavit.

Paragraphs 38 to 41 described the information agents obtained from traditional pen registers and WhatsApp pen registers. While the Residence Affidavit did not include the specific number of communications, the agent summarized that the data showed "a consistent pattern of communications between Sollars, Dickerson, and Awad." (*Id.* at ¶ 39). The agent also described, based on training and experience, how and why public officials use WhatsApp to conceal their communications. (*Id.* at ¶ 40). The agent detailed that he was specifically assigned to investigate public corruption, was an attorney for 8 years, and that the information contained in the affidavit also came from what he learned from other FBI agents and staff. (*Id.* at ¶¶ 1, 7). This agent, too, had the training, experience and common sense to know that public officials who want to conceal their communications with potential bribe payers would likely use encrypted messaging applications like WhatsApp.

Sollars is mistaken that all of the information in the Residence Affidavit regarding the humidor in Sollars's office is exclusively derived from the Apple Warrant. Inexplicably, Sollars never requested an unredacted version of either warrant. Had he done so, he would have learned that on December 13, 2018, CHS-2 met with Sollars's Chief of Staff in Sollars's office where CHS-2 saw a humidor,

29

which was also captured on video by CHS-2. (*Id.* at ¶ 48). After CHS-2 expressed his interest in obtaining a marijuana license from the City, Sollars's Chief of Staff suggested that CHS-2 buy cigars for Sollars and described the type of cigars Sollars preferred. (*Id.* at ¶ 49). The agent believed that Sollars's Chief of Staff was suggesting that CHS-2 would receive favorable treatment from the City in considering CHS-2 marijuana license application. (*Id.* at ¶ 51).

As with the Apple Affidavit, the Residence Affidavit also described that Sollars and his Chief of Staff requested $5,000 from CHS-2 at MGM casino, showing that Sollars had previously demanded money from an individual hoping to do business with the city. (*Id.* at ¶¶ 64-65, 67-70).

Magistrate Judge Patti had a substantial basis to find that there was a fair probability that evidence of the crimes alleged would be found in Sollars's home. The communications derived from the Apple Warrant that were included in the Residence Affidavit alone established probable cause. But even with those communications excised, there was sufficient probable cause to support the Residence Warrant. Sollars contends there was not, but like his argument about the Apple Warrant, Sollars's argument here fundamentally conflicts with settled law on probable cause. His argument disaggregates the totality of circumstances supporting probable causes, and examines facts and inferences in isolation and devoid of context. The Court should reject the defendant's attempts to analyze

whether each piece of the agent's training and experience and case-specific fact is independently sufficient for probable cause.

Instead, the Court should examine the totality of the circumstances and find that even without Sollars's iCloud communications, the Residence Affidavit offered a substantial basis to find probable cause based on the combination of: (1) the defendant's history as a public official of accepting things of value from individuals doing business with the City such as Fiore and CHS-2; (2) information provided by CW that Awad was providing benefits such as new flooring and home renovations to Sollars in exchange for contracts for the City's tax-foreclosed homes; (3) Sollars determined which contractor would be awarded the contracts for the City's tax-foreclosed homes; (4) Sollars specifically directed his City Council to award the contract for tax-foreclosed homes to Awad in 2015; (5) Awad was awarded the contract for tax-foreclosed homes annually since 2015; (6) Sollars travelled to Las Vegas with Awad and Paul Phillips, the owner of a flooring company (one of the benefits CW indicated Sollars received); (7) the agent's training and experience—and the common sense of Magistrate Judge Patti—that one of the reasons individuals engaged in crime would use an encrypted messaging applications such as WhatsApp would be to conceal their communications from law enforcement; (8) Sollars's consistent use of WhatsApp to communicate with Awad contrasted with minimal use of WhatsApp to communicate with his own

Chief of Staff; (9) Sollars's volume of gambling activity contrasted with his annual salary as Mayor; (10) Sollars's and Dickerson's previous request of $5,000 at MGM Casino from CHS-2, who was employed by a company doing business with the City and whose owner, Gasper Fiore, was convicted of federal bribery;  (11) Sollars's travel to Las Vegas in March 2017, paid for by a Fiore employee, followed by the City awarding Fiore's company with a contract worth $114,000; (12) Sollars's Chief of Staff suggested that CHS-2 would receive favorable treatment relating to obtaining a marijuana license from the City if CHS-2 purchased cigars for Sollars; (13) Sollars's Chief of Staff arranged to have Awad's traffic tickets dismissed; and (14) suspicious communications from the iCloud account of Sollars's Chief of Staff regarding campaign contributions being solicited from individuals who have a financial interest in the City. Based on the totality of this information, the Residence Warrant clearly was supported by probable cause.

### IV.   Both warrants were executed in good faith.

Finally, even if the Court were to conclude that the Apple and Residence Warrants were defective, both search warrants exceeded the threshold to satisfy the good-faith doctrine. The Supreme Court has emphasized, time and again, that the "sole purpose" of the exclusionary rule "is to deter further Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236-37 (2011). Application of

the exclusionary rule is a "last resort," *Hudson v. Michigan*, 547 U.S. 586, 596

(2006), justified only where "the deterrence benefits of suppression . . . outweigh

its heavy costs," *Davis*, 564 U.S. at 237. Suppression is only warranted "[w]hen

the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth

Amendment rights," and not when they "act with an objectively reasonable good-

faith belief that their conduct is lawful, or when their conduct involves only simple,

isolated negligence." *Id.* at 238. To trigger the exclusionary rule, police conduct

must be sufficiently deliberate that exclusion can meaningfully deter it, and

sufficiently culpable that such deterrence is worth the price paid by the justice

system. Here, law enforcement reasonably relied upon the warrants signed by

Magistrate Judge Patti, and as such, acted in good faith.

The Supreme Court has identified only four instances where an agent acts

without "objectively reasonable good faith" on a search warrant. *See United States

v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008). The only one relevant here is where

the warrant was "so 'facially deficient' that it could not reasonably be presumed

valid." *United States v. Leon*, 468 U.S. 897, 923 (1984). Sollars relies on that

language to argue that both warrants were based on "bare bones" affidavits. (ECF

No. 97, PageID.588). But in *United States v. Gilbert*, 952 F.3d 759, 763–64 (6th

Cir. 2020), the Sixth Circuit reiterated that, "[a]n affidavit cannot be labeled 'bare

bones' simply because it lacks the requisite facts and inferences to sustain the

magistrate's probable-cause finding; rather, it must be *so* lacking in indicia of probable cause that, despite a judicial officer having issued a warrant, *no* reasonable officer would rely on it." *Id.* (internal quotation marks and citations omitted). If the Court's review of each affidavit can identify "some connection, regardless of how remote it may have been—some modicum of evidence, however slight—between the criminal activity at issue and the place to be searched, then the affidavit is not bare bones and official reliance on it is reasonable." *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017) (quoting *United States v. Laughton*, 409 F.3d 744, 749–50 (6th Cir. 2005). The Sixth Circuit stressed that when officers act with an objectively good faith belief that their conduct is lawful, "excluding evidence recovered as a result of a technically deficient affidavit serves no useful purpose under the exclusionary rule." *Gilbert*, 952 F.3d 759 at 763–64 (citing *Davis v. United States*, 564 U.S. 229, 238 (2011).

Just as the Supreme Court did in *Leon*, this Court too should examine all of the information presented in each affidavit before engaging in the blanket suppression Sollars requests. Both affidavits generally contained the same information that is enumerated on Page 32 (numbered points 1-11) of this response. The Residence Warrant also includes iCloud communications that show that Sollars is likely requesting and accepting things of value. A reasonable officer would not be expected to know that these communications might later be

suppressed. It would be reasonable for the officer to rely on these encrypted

communications which were obtained pursuant to a search warrant authorized and

issued by a federal magistrate judge. Contrary to Sollars' arguments, neither

warrant is bare bones. A reasonable officer would believe both affidavits

established probable cause. Accordingly, the good faith exception should apply

even if probable cause was lacking.

As to the Residence Affidavit only, Sollars claims that the *Leon* good-faith

exception ought not apply because it contains two misleading statements about a

loan being a bribe, and the "likely" need to obtain the phones. (ECF No 97,

PageID.595-96). Sollars relies on *United States v. Sanders,* 59 F.4th 232 (6th Cir.

Feb. 6, 2023). Yet, the Sixth Circuit vacated the *Sanders* opinion on May 24, 2023.

(*See* Gov. Ex. 3: *Sanders* Order). More importantly, his argument ignores a

common sense reading of the affidavit.

"To determine whether a reasonable officer would rely on a judicially

authorized warrant, a reviewing court must read the affidavit reasonably. That

means a court must read it holistically, examining the totality of the circumstances

and employing a healthy dose of common sense." *United States v. White*, 874 F.3d

490, 502 (6th Cir. 2017). "If an inference is obvious from the factual context, a

reviewing court should indulge it." *Id.* Reading the Residence Affidavit

holistically, the Court should reject Sollars' contention that the agent misled the magistrate by including false information.

First, Sollars contends that the agent's characterization of the phrase, "borrow 2 until next week" (*Id*. at ¶ 33), as a bribe is misleading or untrue. (ECF No. 97, PageID.595). Once again, he ignores the rest of the affidavit. In the next paragraph, the agent explains why he believes that Sollars' request to "borrow 2 until next week" is not a request for a loan but a bribe. The agent explains that based on his knowledge of their relationship—which included reading more than 600 encrypted text messages between the two—it is unlikely that Sollars meant to repay the money and that Awad felt he had no choice but to comply with his request to maintain his lucrative contracts with the City. Moreover, one of the target offenses alleged in the Residence Affidavit is theft or bribery concerning programs receiving federal funds, which prohibits a public official from soliciting or accepting "anything of value." 18 U.S.C. § 666(a)(1)(B). Even if the money Sollars requested from Awad was truly a loan, it constitutes something of value that the agent believed Awad paid in order to keep getting the City's contracts.

Lastly, Sollars argues that the agent's statement that searching the Subject Telephones was "likely the only way" to obtain the content of the WhatsApp messages, (Gov. Ex. 2: Residence Warrant, at ¶ 44, filed under seal), dooms the good-faith exception for the Residence Warrant. (ECF No.97, PageID.595-96).

The affidavit clearly states that text messages and iCloud data were obtained pursuant to a federal search warrant and specifically identifies the messages included in the affidavit as being WhatsApp messages. (Gov. Ex. 2: Residence Warrant, at ¶ 30, filed under seal). The agent prominently sets forth in the Residence Affidavit certain WhatsApp and other messages that were stored in Sollars' iCloud account and obtained pursuant to the Apple Warrant. The affidavit cites no less than 14 such exchanges wherein the suspects, including Sollars, discuss gifts, money, home improvements, and other things of value. (*Id*. at ¶¶ 33, 47, 52-55, 57, 60-62, 71-72, 74, 79, 86). The agent's inartful phrase about obtaining content on the phone that might not have been saved in Sollars' iCloud should not be a basis to find that good faith does not apply. Moreover, the agent's statement has no bearing on the probable cause supporting the Residence Warrant, nor was Sollars' phone seized or searched as a result of the Residence Warrant. Rather, agents obtained a separate warrant to search "The Person of Richard Sollars" for his Apple iPhone and seized Sollars' phone under that authority. (Gov. Ex. 4: Sollars' Person Search Warrant and Return, filed under seal). Sollars did not challenge this warrant in his motion.

It was reasonable for law enforcement to rely on both warrants since the affidavits could hardly be considered to be "bare bones." Thus, even if the Court

were to find probable cause lacking, the *Leon* good faith exception should apply to both search warrants.

## CONCLUSION

Both warrants were supported by probable cause and the Apple Warrant was not overbroad. In any event, both warrants are entitled to the good faith exception under *Leon.* Accordingly, Sollars's motions to suppress should be denied.

Respectfully submitted,

Dawn N. Ison
United States Attorney


*s/ Frances Lee Carlson*
Frances Lee Carlson
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9696
frances.carlson@usdoj.gov

*s/ Robert A. Moran*
Robert A. Moran
Assistant United States Attorney
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9553
robert.moran@usdoj.gov

Dated: May 31, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 31, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to:

> Kevin M. Mulcahy
> Todd F. Flood
> Attorneys for Richard Sollars

I further certify that I served a copy of the Government's Sealing Order, together with sealed Exhibits 1, 2 and 4 via email to:

> Kevin M. Mulcahy
> Todd F. Flood
> Attorneys for Richard Sollars

> <u>s/ *Frances Lee Carlson*</u>
> Frances Lee Carlson
> Assistant U.S. Attorney
> 211 West Fort Street, Suite 2001
> Detroit, Michigan 48226-3211
> (313) 226-9696
> frances.carlson@usdoj.gov