UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                               Case No. 19-cr-20836

v.

                               HON. MARK A. GOLDSMITH

RICHARD SOLLARS,

        Defendant.

_____/

**OPINION & ORDER**
**(1) REGARDING THE AMOUNT OF LOSS AND (2) DENYING DEFENDANT'S**
**AMENDED MOTION TO SUPPLEMENT (Dkt. 140)**

Defendant Richard Sollars was charged with conspiracy to commit bribery concerning programs receiving federal funds under 18 U.S.C §§ 371 and 666(a) (Count 1) and wire fraud under 18 U.S.C § 1343 (Count 19). Indictment (Dkt. 1). Sollars pleaded guilty, see Rule 11 Plea Agreement (Dkt. 115), and he is to be sentenced on July 2, 2024. The amount of loss—as to which the parties did not reach agreement in the plea agreement—is relevant for purposes of applying the sentencing guidelines. The Government's position is that the amount of loss in this case for each count falls within the range of $40,000 to $95,000. Id. at 13. Sollars contends that the loss is between $15,518.77 and $34,500.78. Def. Mem. at 1 (Dkt. 136).

Following the hearing, the parties submitted proposed findings of fact and conclusions of law setting forth their respective positions. See Def. Mem.; Gov't Mem.

(Dkt. 137).   Sollars later moved to supplement his proposed findings of fact and conclusions of law.  See Am. Mot. to Suppl. (Dkt. 140).

For the reasons explained below, the Court (i) finds that the amount of loss attributable to bribery conspiracy and wire fraud is within the $45,000 to $95,000 range and (ii) denies Sollars's amended motion supplement (Dkt. 140).

## I.  BACKGROUND

Sollars is the former mayor of the City of Taylor, Michigan.  Sollars engaged in a pay-to-play scheme in which his co-defendant Shady Awad, the owner of a property development company Realty Transition, LLC, provided Sollars with free home renovations, gifts, cash, transportation, and other things of value in exchange for Sollars's assistance with Realty Transition's efforts to purchase and redevelop tax-foreclosed properties through the City's federally funded Right of First Refusal (ROFR) program.  See Indictment ¶¶ 1–10; Rule 11 Plea Agreement at 5–6.  Through this program, Sollars used his authority as Mayor to recommend that the City Council award to Realty Transition all the tax-foreclosed properties acquired by the City through the ROFR program.  Rule 11 Plea Agreement at 6.  As a result, Realty Transition obtained the "vast majority" of the City's ROFR properties.  Id.

On August 22, 2023, Sollars pleaded guilty to conspiracy to commit bribery concerning programs receiving federal funds under 18 U.S.C §§ 371 and 666(a) (Count 1) and wire fraud under 18 U.S.C § 1343 (Count 19).  However, the parties did not reach an agreement on the amount of loss related to the bribery and wire fraud.  Rule 11 Plea Agreement at 13.  In March 2024, the Court held an evidentiary hearing over the course of

four days to determine the amount of loss.  Following the hearing, the parties submitted proposed findings of fact and conclusions of law setting forth their respective positions. See Def. Mem.; Gov't Mem..

Shortly before the March 2024 hearing, the parties stipulated that Sollars received from Shady Awad a new sliding patio door and extra screen valued at $1,898.  3/4/24 Hr'g Tr. at 5 (Dkt. 127).  However, the parties dispute the extent to which Sollars received other benefits as part of the bribery conspiracy and wire fraud scheme and the value of such benefits.  At the hearing, the Court heard testimony regarding the benefits received by Sollars from seven witnesses: (i) Awad; (ii) the owner of Better Hardwood Floors, Paul Phillips; (iii) the City's former Economic Development Director and co-Defendant, Jeffrey Baum; (iv) the owner of Dominick's Market and co-Defendant, Hadir Altoon; (v) the City's Communications Director, Carl Ziomek; (vi) special agent for the Federal Bureau of Investigations, Phillip Reed; and (vii) Sollars's wife, Alicia Sollars.

Based on the testimony and evidence introduced during the hearing, the parties dispute the amount of loss related to the bribery and fraud counts and the corresponding sentencing enhancements under U.S.S.G. § 2B1.1.  The Government maintains that the amounts of loss associated with the bribery count and fraud count are between $40,000 and $95,000, such that Sollars is subject to a six-level enhancement for each count.  Sollars disputes the amount for each count and argues that the loss associated with the bribery conspiracy was no greater than $34,500.78, meaning that Sollars would be subject to a four-level enhancement.  Def. Mem. at 30.  U.S.S.G. § 2B1.1(b)(1)(B)–(C).  With respect

to the wire fraud, Sollars maintains that the amount of loss is less than $6,500 and, therefore, there is no increase in levels under § 2B1.1(b)(1)(A)–(E). Id. at 31.

## II.  ANALYSIS

Section 2B1.1's sentencing enhancements apply to the offenses of bribery and wire fraud.  See U.S.S.G. § 2B1.1; § 2C1.1(b)(2) (providing that the number of enhancement levels for soliciting or receiving a bribe increases according to the table in § 2B1.1).  As relevant here, this section states that a defendant's offense level should (i) not increase for a loss of $6,500 or less, (ii) increase by four levels for a loss of more than $15,000 but not greater than $40,000, and (iii) increase by six levels for a loss of more than $40,000 but not greater than $95,000.  Id. § 2B1.1(b)(1)(A)–(E).

"The government bears the burden of proving the applicability of the offense level enhancement under Section 2B1.1 . . . by a preponderance of the evidence."  United States v. Freund, No. 03-20004, 2008 WL 4601802, at *7 (E.D. Mich. Oct. 14, 2008) (citing United States v. Finkley, 324 F.3d 401, 403 (6th Cir. 2003)).  Because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," U.S.S.G. § 2B1.1(b)(1), cmt. 3(C), a district court's findings regarding the amount of loss "are not to be overturned unless they are clearly erroneous," United States v. Triana, 468 F.3d 308, 321 (6th Cir. 2006).  To show clear error, a defendant must show that the calculation "was not only inexact but outside the universe of acceptable computations."  United States v. Martinez, 588 F.3d 301, 326 (6th Cir. 2009) (punctuation modified).

4

"The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he fair market value of the property unlawfully taken . . . ."  U.S.S.G. § 2B1.1(b)(1), cmt. 3(C)(i).  Ultimately, "[t]he court need only make a reasonable estimate of the loss," meaning that the estimate need not be determined with precision.  Id. § 2B1.1(b)(1), cmt. 3(C); Triana, 468 F.3d at 320.

The Court first discusses the losses related to Sollars's acceptance of bribes (Count 1) and then discusses the loss attributable to fraud (Count 19).  As the Court explains below, the Government has met its burden of demonstrating by a preponderance of the evidence that the value of bribes and fraud each are between $40,000 and $95,000.

### A.  Amount of Loss Related to Bribes

The Court begins by assessing the evidence regarding the value of the benefits that Sollars received as bribes.

### 1. Installation of Hardwood Flooring for Sollars's Residential Home

At the hearing, the Government set forth evidence that Awad coordinated and paid for numerous home-renovation services for the Sollarses' residence in Taylor, Michigan.  Awad testified that he worked with Phillips to furnish Sollars's home with hardwood floors.  3/4/24 Hr'g Tr. at 24–25, 31.  According to Awad, in 2016, Awad supplied hardwood valued at $1,050 and paid Phillips $1,700 to install the flooring in Sollars's home—all without reimbursement from Sollars.  Id. at 31–34.  Awad's testimony is supported by text messages between Awad and Sollars in which Awad facilitates the scheduling of the installation of the hardwood floors in Sollars's home and Awad thanks

Sollars for the business opportunities.  Gov't Mem. at 6; 7/26/16 Text Messages (Gov't Ex. 6).  Further, the Government submitted an August 12, 2016 invoice from Better Hardwood Floors for installation of flooring at Sollars's residence.  8/12/16 Invoice (Gov't Ex. 7).  All told, the Government submits that Awad's furnishing of the Sollars's residence with hardwood floors amounts to $2,750 in benefits—$1,700 for installation and $1,050 for materials.

Sollars does not set forth any contrary evidence to undermine the valuation set forth by the Government.  Def. Mem.  Instead, Sollars argues that Awad paid for the wood-floor installation on his own and that there was not an express agreement that Sollars would further Awad's business in exchange.  Id. at 14.  But this position is undercut by Awad's testimony.  As Awad explained at the hearing, he provided the hardwood flooring services to Sollars because Sollars provided Awad with "100 properties at once" through the City's ROFR program.  3/4/24 Hr'g Tr. at 28–29.  Considering such evidence, the Court is satisfied that the hardwood flooring services constitute a benefit Sollars received as part of the bribery scheme to which he pleaded guilty.

The Court finds that the Government has met its burden of showing by a preponderance of the evidence that, as part of the bribery conspiracy, Sollars corruptly received $2,750 in benefits related to the furnishing of his residential home with hardwood floors in 2026.

### 2. Painting Services for Sollars's Residential Home

The Government contends that Awad coordinated and paid for exterior and interior painting services for Sollars's residential home in August and October of 2016.  Gov't

Mem. at 10.  It submits that Sollars received $2,500 worth of exterior home painting services and $4,726.47 in interior home painting services.  Id. at 10–11.

Regarding the exterior painting services, the Government supports its valuation with Awad's testimony, who at the hearing stated that he paid contractor Superior Homes $2,500 to paint the exterior of Sollars's home.  3/4/24 Hr'g Tr. at 36–37, 44.  Text messages between Awad and Sollars from the time the house was painted further corroborate the Government's valuation.  See 9/5/16 Text Messages (Gov't Ex. 14) (text message from Awad to Sollars stating that the paint job would be "about a 2500 job").

The Government also introduced evidence showing that Sollars received interior painting services valued at $4,726.47.  At the hearing, Awad testified that he (i) paid Superior Homes $3,500 to perform the interior paint work, see 3/4/24 Hr'g Tr. at 177; (ii) provided $736.31 in painting supplies used for that project, id. at 39; (iii) paid for $425 worth of paint and tile trim materials, id. at 41; and (iv) provided $65.16 in paint from Sherwin Williams, id. at 40–42.  Awad's testimony is further corroborated by documentary evidence showing that he, or Realty Transitions, purchased these items.  See 7/1/19 Order Report (Gov't Ex. 16); Realty Transition Bank Screenshot (Gov't Ex. 17); 10/11/16 Credit Card Purchase Record (Gov't Ex. 18).

Sollars fails to cite any evidence challenging the Government's valuation of the painting services he received.  With respect to the exterior paint, he argues that the work performed should be valued at $0 because such work was not "a gift or bribe to Sollars." Def. Mem. at 16.  In support, Sollars points to Awad's testimony explaining that he directed Superior Homes to complete the work as requested.  See id. (citing 3/5/24 Hr'g Tr. at 29

7

(Dkt. 128) (Awad testifying that he told Superior Homes to "just do [the work requested of it] and we'll bill them later")). However, the testimony relied upon by Sollars is consistent with the Government's position that the painting services Sollars received from Awad were part of the conspiracy to receive bribes in connection with the ROFR program.

Sollars's argument regarding the valuation of the interior painting services similarly fails. He maintains that "[he] was not given an opportunity to pay Superior [Homes] as he was never formally invoiced by Awad." Def. Mem. at 19. This argument lacks merit. Given the corrupt relationship to which Sollars has admitted, it makes sense that Awad did not provide Sollars with an invoice that would never be fulfilled. And while Sollars also points to Alicia Sollars's testimony that she completed some of the interior paint work, see 3/12/24 Hr'g Tr. at 93–94, 109–110, 112 (Dkt. 130), her testimony fails to show that Superior Homes provided Sollars with less than $3,500 of interior painting services. Indeed, Sollars provides no evidence or testimony showing the value of Alicia Sollars's work or that such work offsets the value of the work performed by Superior Homes.

The Court finds by a preponderance of the evidence that Sollars received $7,226.47 ($2,500 in exterior painting services and $4,726.47 in interior painting services) in painting services for the exterior and interior of Sollars's residential home as part of the bribery scheme.

### 3. Humidor

The Government submits that Awad purchased for Sollars's office a humidor valued at $1,804.27. Gov't Mem. at 14. Sollars responds that Awad purchased the humidor as a gift to the City. Def. Mem. at 18.

The Court agrees with the Government.  The preponderance of the evidence shows that Awad's purchase of the humidor should be included in the calculation of the amount of loss related to Sollars's bribes.  Awad testified that he purchased the humidor because Sollars "asked for it," and that by doing so Award hoped that Awad and Realty Transition would be able to obtain a development contract with the City for 2017.  3/4/24 Hr'g Tr. at 48.  Text messages from the time Awad purchased the humidor corroborate Awad's testimony.  In September 2016, Sollars texted his chief of staff Bobby Dickerson a website link for a "Redford" humidor model and indicated that the mayor of the City of Westland has a similar humidor.  9/23/24 Text Messages (Gov't Ex. 21).  Three days later, Awad sent a text message to Sollars containing a screenshot of an invoice for the Redford humidor he purchased.  See 3/4/24 Hr'g Tr. at 48 (Awad testifying about text messages he sent to Sollars regarding the humidor); 9/26/24 Text Messages (Gov't Ex. 21).  Sollars replied by asking whether the humidor included Cuban cigars; Awad responded: "Once I break even we'll go to Cuba."  9/26/24 Text Messages.  This evidence is sufficient for the Court to find that Awad's purchase of the humidor was ultimately related to Awad's desire to continue to benefit from the ROFR program.

Resisting this conclusion, Sollars points to testimony from Awad stating that he initially purchased the humidor as a gift to the City.  See Def. Mem. 16 (citing 3/4/24 Hr'g Tr. at 188).  But at the hearing, Awad explained that his reasons for purchasing the humidor were directly tied to the ROFR program:

> He asked for it, I purchased it in hopes that we were starting to get properties removed in 2016 and then on top of adding a new developer once we pretty much paved the way in 2015 so I was hoping for the 2017 contract.  We could

expand our business and do in 2017 and have limited properties removed
from our contract.

3/4/24 Hr'g Tr. at 48.  Moreover, the evidence shows that the humidor was for Sollars's

personal use—not the City's.  Id. at 51 (Awad testifying: "so by him putting [cigars

purchased by Awad] in his humidor [and] locking it, at that point in time it knew it was

just for him [be]cause nobody had access to just go in there and grab a cigar").  Baum also

testified that the purchase of the humidor was for Sollars's personal use—not the City's

use.  3/5/24 Hr'g Tr. at 164 (recalling that Dickerson and Sollars discussed obtaining a

humidor for Sollars).  Based on this evidence, the Court cannot agree with Sollars that

Awad's purchase of the humidor was not part of the bribery conspiracy.

Based on the above evidence, the Court finds that the Government has met its

burden of showing by a preponderance that the $1,804.27 value of the humidor is

appropriately included in the total loss amount related to the bribery conspiracy.

### 4. Hardwood Floors for Sollars's Lake House

The Government submits that Awad provided Sollars with new hardwood floors

valued at $8,800 for Sollars's lake house located in Cement City, Michigan.  Gov't Mem.

at 16.  Sollars disputes the Government's valuation and argues that the amount of loss

related to such services is not more than $3,000.  Def. Mem. at 20–21.

The Government has carried its burden of showing by a preponderance of the

evidence that Sollars received $8,800 worth of hardwood flooring services as part of the

bribery scheme.  At the hearing, Awad testified that he directed Phillips to install the

hardwood floors and paid Phillips $6,962 for such services.  3/5/24 Hr'g Tr. at 55.  Awad's

testimony is corroborated by text messages between Awad and Phillips.  Specifically, in April and May of 2017, Awad texted Phillips the address of the lake house and asked about the date of expected completion and progress of work.  4/19/17 Text Messages (Gov't Ex. 25).  Later in May, Phillips sent a text message to Awad stating that the bill for the floors was $6,962.  Id.  Regarding the remaining balance, Phillips and Awad's testimony shows that Awad provided roughly 1,200 square feet of wood flooring material that Phillips installed in Sollars's home.  See 3/5/24 Hr'g Tr. at 18, 72–73 (explaining that the typical cost for wood was $1.50 per square foot and that Awad provided 1,200 square feet for the lake house hardwood installation).

Sollars seeks to undermine the Government's evidence by pointing out that Phillips billed Awad by using a single invoice listing 9855 Morton View to conceal the work performed on Sollars's lake house.  Def. Mem. at 20.  He argues that the Government cannot "distinguish the billing discrepancies between the work done in the lake house and that of 9855 Morton View."  Id. (citing 3/5/24 Hr'g Tr. at 77).  Sollars's argument is without merit.  Both Phillips and Awad explained that the invoice was a device to fraudulently attribute work performed on Sollars's lake house to one of Awad's development properties.  See 3/4/24 Hr'g Tr. at 58; 3/5/24 Hr'g Tr. at 76–77.  The fraudulent invoice is simply not a reliable indicator of the value of the hardwood flooring services Sollars received.

The Government has met its burden of showing that Sollars received $8,800 worth of value related to the hardwood flooring services for Sollars's lake house.

### 5.  Kitchen Appliances

The Government submits that Awad provided Sollars with $5,300 worth of kitchen appliances from ABC Warehouse in June 2017.  Gov't Mem. at 18.  Sollars contends that the value of the appliances is $1000 or less.  Def. Mem. at 21.

In support of his position, Sollars cites testimony from Alicia Sollars, who at the hearing said that the Sollars exchanged the "original/like-new" white appliances purchased in 2015 or 2016 for the new black appliances.  Id.  Sollars argues that, because "the appliances were exchanged, there should be an offset to the amount claimed to have been paid by Awad."  Id.  But the evidence undercuts Sollars's argument.  As the Government points out, photographs of the Sollarses' home show the same white appliances present in the Sollarses' kitchen since at least December 2012—indicating that Alicia Sollars's memory about the age and condition of the appliances was flawed.  3/12/24 Hr'g Tr. at 44, 77–80.

Setting Alicia Sollars's unreliable testimony aside, Sollars offers no evidence to support his position that his receipt of new appliances in 2017 constitutes an exchange that decreases the value of the appliances he received.  Without such evidence, the Court is left to guess as to the value of any alleged exchange by Sollars.  By contrast, the Government offers substantial evidence showing that Awad purchased new appliances from ABC Warehouse worth $5,300 that were delivered to the Sollarses' home.  See 3/4/24 Hr'g Tr. at 63; ABC Warehouse Invoice (Gov't Ex. 32).

The Court finds by a preponderance of the evidence that Sollars corruptly received $5,300 as part of the bribery conspiracy through Awad's purchase of new kitchen appliances for Sollars.

### 6. Deck Refinishing

At the hearing, the Government introduced evidence that, in July 2017, Awad paid Phillips $2,900 to refinish the deck of Sollars's residential home.  See 3/4/24 Hr'g Tr. at 72 (Awad testifying that the total cost for Phillips to refinish Sollars's deck was $2,900). Text messages between Awad and Phillips from July and August 2017 corroborate Awad's testimony.  See 8/1/17 Text Messages (Gov't Ex. 36) (Phillips texted Awad stating: "Total bill $2900 but I'll take care of the $900 towards what I owe u for wood, so just remaining $2000").

Sollars argues that the value of the deck refinishing was no greater than $1,000.  He points to Phillips's testimony that the actual cost of the refinishing job was $1,000.  3/5/24 Hr'g Tr. at 104–105.  This argument fails.  As Phillips explained at the hearing, the $1,000 figure is the cost to Phillips to perform the service—not the fair market value of the refinishing work.  See id.

Sollars also argues that, because the workmanship of the deck refinishing was poor, the fair market value is no more than $1,000.  In support of this position, Alicia Sollars testified that Richard Sollars and their son "ended up redoing the deck."  3/12/24 Hr'g Tr. at 98–99.  But the lone fact that the Sollars was underwhelmed by the quality of the refinishing work provides no support for his position that such work was worth only $1,000.  Indeed, Sollars provides no evidence to support such a valuation.

Based on this evidence available to it, the Court finds that the Government has met its burden of showing by a preponderance of the evidence that Sollars corruptly received $2,900 in benefits as part of the bribery conspiracy.

### 7. Garage Door

The parties agree that Sollars received $3,845 in value through Awad's purchase of a new garage door for Sollars.  Def. Mem. at 23; Gov't Mem. at 21–22.  The Court finds that Sollars received $3,845 in benefits as part of the bribery conspiracy.

### 8. Garage Locker System

The parties agree that Sollars received $4,550 in value through Awad's purchase of custom lockers for Sollars.  Def. Mem. at 23–24; Gov't Mem. at 22–23.  The Court finds that Sollars received $4,550 in benefits as part of the bribery conspiracy.

### 9. Metal Tool Cabinets

The parties agree that Sollars received $1,242.77 in value through Awad's purchase of metal tool cabinets for Sollars.  Def. Mem. at 24; Gov't Mem. at 24–25.  The Court finds that Sollars received $1,242.77 in benefits as part of the bribery conspiracy.

### 10. Hardwood Flooring for Basement of Sollars's Residence

The parties agree that Sollars received a total of $8,1654.64 in benefits in the form of hardwood flooring services for Sollars's basement in his residential home.  Def. Mem. at 24; Gov't Mem. at 25.  However, the parties disagree as to whether this value should be included in the calculation of the loss amount stemming from Sollars's bribery conspiracy.

Sollars argues that his receipt of hardwood flooring services for his basement should not be included in the loss amount because—although he admits that he never paid for such

work—"he intended to pay Phillips directly . . . . but was not given an opportunity to do so." Def. Mem. at 24.   In support of this assertion, Sollars points out that he had previously paid Phillips $2,500 for hardwood flooring in another portion of Sollars's house. Id. (citing 3/12/24 Hr'g Tr. at 91 (Alicia Sollars testifying that she paid Phillips $2,500 for hardwood flooring services for other areas of the house)).   He argues that this prior payment to Phillips shows that Sollars had made the same arrangement for the basement hardwood floors.  See id.

Sollars's position lacks merit.  Even assuming that Sollars previously paid Phillips for hardwood flooring services on another portion of Sollars's home, this fact provides no indication that Sollars intended to pay for the installation of floors in the basement of the home.  Sollars has received multiple home-improvement services from Phillips without paying for them. Thus, Sollars's receipt of hardwood flooring services from Phillips without payment is entirely consistent with Sollars's past dealings with Phillips.   At bottom, Sollars provides the Court with no evidence from which it could conclude that Sollars intended to pay Phillips for the hardwood floors installed in Sollars's basement.

The Court finds by a preponderance of the evidence that, as part of the bribery conspiracy, Sollars received benefits in the amount of $8,8165.64 through Awad's payment of the labor ($4,550) and materials ($3,615.64) for Sollars's basement floor installation.

## 11.  Washer and Dryer Appliances

The parties agree that, in March 2018, Awad purchased new washing and drying machines for Sollars valued at $3,678.65.   See Gov't Mem. at 27; Def. Mem. at 25. However, Sollars argues that this sum should not be included in the calculus for

15

determining the loss amount because he exchanged his old washer and dryer appliances for the new appliances.  Def. Mem. at 25 (citing 3/12/24 Hr'g Tr. at 99–101 (Alicia Sollars testifying that the Sollars exchanged their old washer and dryer for new appliances from purchased by Awad)).  Sollars argues that the value of the new washer and dryer must be "offset" by the alleged exchange.  Def. Mem. at 25.

Sollars's argument fails.  Even were the Court to credit Alicia Sollars's testimony regarding the alleged exchange, Sollars offers no evidence or testimony from which the Court could determine the value of the exchanged appliances.  The Court finds by a preponderance of the evidence that Sollars received $3,678.65 in value from Awad as part of the bribery conspiracy.

### 12. Vacuum Cleaner

The Government submits that in September 2018 Awad purchased for Sollars a vacuum cleaner valued at $634.94.  Gov't Mem. at 28.  In support, the Government points to text messages between Awad and Sollars in which Sollars appears to approve Awad's purchase of the vacuum, see 9/21/18 Text Messages (Gov't Ex. 71), and an Amazon order confirmation showing that Awad purchased the vacuum on September 24, 2018 (Gov't Ex. 73).

Sollars disputes the Government's position.  He argues that Awad purchased the vacuum as "an in-kind contribution for the City of Taylor pursuant to the Development Agreement."  Def. Mem. at 25.  Sollars's argument fails.  He cites no evidence to support his claim that the vacuum was for the City's use.  Indeed, the evidence shows that Awad ordered the vacuum for delivery to Sollars's address.

The Court finds by a preponderance of the evidence that Sollars received $634.94 in benefits as part of the bribery conspiracy.

### 13.  Hardwood Flooring for the Main Floor of Sollars's Residence

The Government submits that, as part of the bribery conspiracy, Sollars accepted $2,500 worth of hardwood flooring services for the main floor of his residence.  Gov't Mem. at 30.  Sollars does not challenge this valuation.  Instead, he argues that this figure should not factor into the loss calculation based on testimony from Alicia Sollars, who testified at the hearing that she paid Phillips for the flooring services.  See Def. Mem. at 26 (citing 3/12/24 Hr'g Tr. at 91).

The Court agrees with the Government.  Although Alicia Sollars testified that she paid Phillips for the services, her testimony is contradicted by the Government's evidence showing that Awad paid for the flooring.  Specifically, the Government points to text messages between Awad and Phillips from the time of the installation in October 2018 in which Awad arranges for Phillips to pick up the check for $2,500.  See 10/12/18 Text Messages (Gov't Ex. 74).  The Government also produced the check that Awad used to pay Phillips the $2,500 sum.  See 10/12/18 Check (Gov't Ex. 75); 3/4/24 Hr'g Tr. at 105–106 (Awad confirming that he used the October 12, 2018 check to pay Phillips for the hardwood flooring services).

The Court finds that the $2,500 Sollars received in hardwood flooring services for the main floor of his residential home should be included as a benefit he received from Awad as part of the bribery conspiracy.

17

### 14. Front Door for Sollars's Residential Home

The parties agree that Sollars received from Awad a front door valued at $6,000 for Sollars's residential home.  Gov't Mem. at 32; Def. Mem. at 26.  They disagree, however, regarding whether the item was part of the bribery conspiracy.  Sollars argues that the value of the front door should not be included in the loss calculus because the provider of the front door—an individual named Jennifer Mehdi—"never sent someone out to request payment."  Def. Mem. at 26 (citing 3/12/24 Hr'g Tr. at 104).

Sollars's attempt to characterize his receipt of the door as separate from the bribery scheme fails.  The Government has presented evidence showing that Awad paid for the door and had communicated that fact to Sollars.  See Gov't Mem. at 33 (citing 3/4/24 Hr'g Tr. at 107–108 (Awad explaining that he implied via text message to Sollars that Awad would "cover" the cost of the door)); 10/23/18 Invoice (Gov't Ex. 78) (invoice showing a $6,000 balance due from Shady Awad for door installed at the address of Sollars's residential home); 12/6/18 Receipt (Gov't Ex. 79) (reflecting payment received from Awad for the door).

Based on this evidence, the Court is satisfied that the Government has demonstrated by a preponderance of the evidence that Awad paid $6,000 for Sollars's front door and that this benefit should be included in the amount of loss related to the bribery conspiracy.

### 15. Camera and Warranty

 The Government submits that in December 2018 Sollars directed Awad to purchase for Sollars's wife a camera and accompanying warranty valued at $4,043.98.  Gov't Mem. at 33.

Sollars does not dispute that Awad purchased the camera; rather, he asserts that Awad purchased the camera as a gift for the City.  Def. Mem. at 27.  In support of this position, Sollars points out that the City's then-communications director, Carl Ziomek, testified that he certified the camera as a gift to the City according to the City's procurement procedure.  Def. Mem. at 27 (citing 3/6/24 Hr'g Tr. at 166 (Dkt. 129) (Ziomek stating that he "eventually sen[t] [the camera] through the proper procedure to be . . . registered with the City")).

The Court is not convinced by Sollars's argument.  Although the camera was eventually registered as a gift to the City, Def. Mem. at 27, the evidence shows that Sollars only registered the camera to avoid further detection from authorities.  Sollars registered the camera with the City almost three months after it was purchased—shortly after his house was searched by the FBI in February 2019, see 3/12/24 Hr'g Tr. at 18 (testimony of Special Agent Reed explaining that the FBI photographed the camera in a closet in Sollars's master bedroom during its February 19, 2019 search of the home).  By the time Sollars attempted to register the camera as a gift to the City, he had already used it for personal purposes.  3/6/24 Hr'g Tr. at 164.

Based on all of the evidence related to the camera, the Court finds that the Government has shown by a preponderance of the evidence that Sollars received the camera and warranty as a benefit valued at $4,043.98 from Awad as part of the bribery conspiracy.

### 16.  Credit Card Transactions at Dominick's Market

19

According to the Government, Sollars received $19,682.01 by charging Awad's credit card at Dominick's Market and then giving the cash to Sollars.  Gov't Mem. at 36–37.  At the hearing, the Government introduced several sources of evidence to support its valuation of losses stemming from the credit card transactions.  It elicited testimony from Awad who explained that, on seven different occasions, Sollars directed that charges be made on Awad's credit card at Dominick's Market so that Awad could give Sollars the cash value of the charge.  3/4/24 Hr'g Tr. at 115–117; Summary of Awad Credit Card Charges (Gov't Ex. 86).  The Government also cites Awad's credit card statements reflecting the seven charges to Dominick's Market that corroborate his testimony.  See Awad Credit Card Statements (Gov't Ex. 85).

The Government further supports its position through Baum's testimony, who recalled that he learned of Sollars's practice of charging Awad's credit card in November 2017.  3/5/21 Hr'g Tr. at 171–172.  Baum's testimony is corroborated by text messages from November 9–11, 2017 between Baum and Sollars.  November 2017 Text Messages (Gov't Ex. 84).  In these messages, Baum and Sollars lament that Sollars's attempt to charge Awad's credit card was rejected until Awad was later able to send them the information for the credit card that could accommodate the charge.  Id.  Sollars further indicated to Baum that he would retaliate against Awad for failing to timely provide his credit card information.  Id. (Sollars text message stating: "[Awad] is about to get the fucking silent treatment from me in a few months . . . He is definitely getting split up this year . . . .")

Altoon also testified at the hearing and further corroborated the Government's position.  Altoon recounted that he would charge Awad's card and give the balance to Sollars after deducting the surcharge.  3/6/24 Hr'g Tr. at 39–40.

Sollars attempts to dispute the Government's valuation of the credit card transactions by making two arguments.  First, he argues that the Court should not credit the testimony of Awad, Altoon, or Baum because they are "self-interested witnesses" with "incentives to lie and each have admitted that they committed serious crimes . . . ."  Def. Mem. at 10.  Next, Sollars maintains that $5,000 of the $19,682.01 sum alleged by the Government should not be included in the loss amount because Baum recalled that it was a donation for a "cigar event" for Sollars's campaign.  Id. at 9, 11–12.

Neither of Sollars's arguments has merit.  Although Sollars questions the reliability of the Government's witnesses, as the Court explains above, text messages and credit card statements corroborate the witnesses' testimony.

Sollars's attempt to characterize $5,000 of those charges as a campaign contribution also fails.  Although Baum testified that he "believed [the $5,000] was for the cigar event," he later equivocated, stating that he could not "remember exactly what it was for."  3/6/24 Hr'g Tr. at 141.  Baum also explained that cash donations of the sort that Sollars asserts occurred here "were never put on the reports" disclosing campaign contributions.  In other words, even if the $5,000 was related to the cigar event, it was not properly disclosed and cannot be considered a permissible campaign contribution.  Baum's testimony—when viewed in its entirety—provides the Court with no reason to exclude the $5,000 from the total loss amount stemming from the credit card transactions at Dominick's Market.

21

The Court finds that the Government has shown by a preponderance of the evidence that Sollars received approximately $19,197.83 in cash benefits from Awad through the credit card transactions at Dominick's Market as part of the bribery conspiracy.

**B. Amount of Loss Related to Fraud (Count 19)**

The Court now addresses the amount of loss stemming from the wire fraud (Count 19). The Government submits that the total amount of loss attributable to Sollars's wire fraud scheme and any relevant conduct is $70,362.98.   Gov't Mem. at 62.  It sets forth evidence of five categories of fraud, namely, Sollars's receipt of (i) $10,000 in cash donations paid to the Committee to Elect Rick Sollars, Jr. (CTE), (ii) $8,791.88 of funds related to the pay-off of a lease balance for his vehicle, (iii) $2,473.91 of funds withdrawn from the CTE account and for Sollars's personal use, (iv) $36,522.19 of funds from a fraudulent catering scheme, and (v) $12,575 in funds from corporate donations intended for the catering of City events.  Id.

Sollars contends that the total loss amount is $6,500 or less.  Def. Mem. at 30.  He argues that the Government's valuation is unsupported because "[t]here was virtually no testimony that provided a breakdown of the funds that were putatively used for campaign or city events as compared to those that were kickbacks."  Id. at 31–32.  Aside from challenging the sufficiency of the Government's evidence, Sollars cites no evidence to contradict the Government's loss valuations related to wire fraud.  See Def. Mem.

For the reasons discussed further below, the Court finds that the Government has demonstrated by a preponderance of the evidence that the total amount of loss attributable to Sollars's wire fraud scheme and any relevant conduct is $70,362.98.

### 1.  Cash Donations to CTE

The Government submits that Sollars stole a total of $10,000 in cash stemming from two $5,000 donations: one from the owner of a medical marijuana facility, Mark Asmar, and another from Altoon.  According to the Government, the donors had intended for the money to obtain them "leadership circle" status at Sollars's annual cigar fundraising event. Gov't Mem. at 42.

In support of the Asmar donation, the Government cites testimony from Baum who said that, in December 2018, he picked up the $5,000 in cash from Asmar at his marijuana facility and delivered the funds to Sollars by placing the cash in the front seat console of Sollars's vehicle, as instructed by Sollars.  Id. (citing 3/5/24 Hr'g Tr. at 159–163).  Text messages between Baum and Asmar help to corroborate Baum's testimony by showing that the pair had met at Asmar's facility on December 13, 2018.  12/14/18 Text Message (Gov't Ex. 122) (Baum stating: "Hey Mark. Thanks for the tour yesterday. Here is my business card information.").

Regarding the Altoon donation, Baum testified that he received from Altoon $5,000 in cash that was intended for a campaign event.  3/6/24 Hr'g Tr. at 136. Altoon corroborated Baum's testimony. At the hearing, Altoon confirmed that he gave Baum $5,000 cash so that he could be part of the Leadership Circle for a cigar fundraising event for Sollars.  Id. at 40–41.  Altoon gave the money because he wanted to be "promoted" to be a developer for the City the next year.  Id.  Altoon's $5,000 "donation" was never deposited into the CTE bank account.  Id. at 148–149.

Based on the above uncontroverted evidence, the Court finds that the Government has met its burden of showing by a preponderance of the evidence that Sollars received $10,000 in cash that was intended for the CTE account.

### 2. Lease Pay-Off

The Government submits that Sollars fraudulently received $8,791.88 through the pay-off of a lease for his vehicle from CTE funds. Gov't Mem. at 44. As Baum explained, Sollars leased a vehicle in his own name, but the CTE made the monthly lease payments. Id. (citing 3/5/24 Hr'g Tr. at 168; 3/6/25 Hr'g Tr. at 105–106). In November 2016, Sollars asked Baum to pay off the lease balance for his vehicle using funds from the CTE account. 3/5/24 Hr'g Tr. at 168. Following Sollars's direction, Baum issued a check from the CTE account for $20,576.82 payable to General Motors Financial Leasing and mailed it to pay off Sollars's lease. Id. at 168–169; 11/16/16 Check (Gov't Ex. 121). Sollars later obtained a new vehicle and, as a result, was refunded the balance of the pre-paid lease of the prior vehicle. 3/5/24 Hr'g Tr. at 169–170; 3/12/24 Hr'g Tr. at 28 (Special Agent Reed testifying that Sollars deposited a check for the balance of the prepaid lease term). Sollars never refunded the CTE for the balance of the lease term for the prior vehicle. Id.

Sollars makes no argument regarding the loss amount of the lease pay-off. See Def. Mem. The Court finds that the Government has met its burden to show by a preponderance of the evidence that Sollars fraudulently received at least $8,791.88 constituting funds belonging to the CTE.

### 3. Fraudulent Credit Card Withdrawals

24

The Government submits that Sollars used the CTE debit card to make withdrawals and purchases in Las Vegas during two personal trips—one in May 2018 and the other in February 2019.  Only Baum and Sollars had access to the CTE account through debit cards. 3/5/24 Hr'g Tr. at 152.  Baum explained that he was not in Las Vegas in May 2018 or February 2019 nor were campaign events held during these times.  3/6/24 Hr'g at 150–151.

As reflected on Government's Exhibit 141, from May 21, 2018 through May 25, 2018, Sollars used the CTE debit card to make withdrawals and purchases in Las Vegas totaling $696.67:

- 5/21/18: Withdrawal $87.00

- 5/23/18: Debit card withdrawal–Delta Blvd, Las Vegas $60.00

- 5/24/18: Debit card withdrawal–Palm Restaurant, Las Vegas Blvd. $345.51

- 5/25/18: Debit card withdrawal–Caeser's Hotel and Casino $204.16

From February 2, 2019 through February 5, 2019, Sollars used the CTE debit card to make withdrawals and purchase in Las Vegas totaling $1,777.43:

- 2/02/19: Debit card withdrawal–Nike Las Vegas $331

- 2/02/19: Debit card withdrawal–Tommy Bahama Las Vegas $215.42

- 2/02/19: ATM withdrawal–Caeser's Palace Hotel Las Vegas $989.99

- 2/05/19: Debit card withdrawal–Caeser's Hotel and Casino     $240.83

The Court finds by a preponderance of the evidence that the Las Vegas withdrawals from the CTE account in the total amount of $2,473.91 constitute personal and fraudulent

spending by Sollars of funds that campaign donors believed would be used for legitimate campaign expenditures.

### 4. False Catering Checks

The Government submits that Sollars received $36,522.20 through a fraudulent check scheme involving Baum and Altoon.  Gov't Mem. at 47.  According to the Government, Sollars asked Altoon to cash checks issued to Dominick's Market from the CTE account.  Id. (citing 3/5/24 Hr'g at 166–168).  Although the checks purportedly paid Dominick's Market for catering services, the Government points out that Altoon sometimes provided no catering services or falsely inflated the cost of such services.  Once the checks were cashed, Altoon would kick back the difference between the actual cost of the catering and the amount of the check to Sollars.  Id. at 166–168; 3/6/24 Hr'g at 17–19. The checks would be returned to Baum as treasurer for recordkeeping purposes.  3/5/24 Hr'g at 166–168.  Altoon testified that he agreed to participate in this scheme because he wanted to be a preferred developer with the city and qualify to receive houses to rehabilitate.  3/6/24 Hr'g Tr. at 21.

At the hearing, Altoon identified four checks payable to Dominick's Market, totaling $16,849, that Sollars tendered to Altoon where no catering services were provided. In each case, the entire amount of the check was given to Sollars in cash or scratch-off lottery tickets.  3/6/24 Hr'g Tr. at 19–29.  As provided in the Government's memorandum, the fraudulent checks are as follows:

- Gov't Ex. 95: CTE check #1451 for **$4,250**, dated December 15, 2017, for "employee party food."

- Gov't Ex. 98: CTE check #1462 for **$4,274**, dated February 12, 2018, for "S.O.C. [State of the City] 2018."

- Gov't Ex. 100: CTE check #1508 for **$3,750**, dated June 29, 2018, for "TSF [Taylor Summer Festival] sponsors."

- Gov't Ex. 106: CTE check #1558 for **$4,575**, dated January 3, 2019, for "S.O.C. [State of the City] 2019."

Gov't Mem. at 50 (citations omitted, emphasis in original).

As set forth in the Government's memorandum, see Gov't Mem. at 50–51, Altoon also identified specific CTE checks payable to Dominick's Market, totaling $13,472.49, that Sollars tendered to Altoon, and for which Altoon provided some catering, but the checks falsely inflated the actual cost and gave Sollars the difference in cash or lottery tickets:

- Gov't Ex. 87: CTE check #1429 for $1,300, dated September 28, 2017, for "Senior Catering." Altoon provided approximately $900 of catering and gave **$400** to Sollars.

- Gov't Ex. 91: CTE check #1336 for $4,250, dated December 1, 2017, for "Employee Holiday Party." Altoon provided approximately $1,300 of catering and gave **$2,950** to Sollars.

- Gov't Ex. 96: CTE check #1452 for $5,600, dated December 15, 2017, for "Catering Superbowl City Hall." Altoon provided approximately $1,200 of catering and gave **$4,400** to Sollars. Sollars admitted in his plea agreement that he wrote this check from his CTE account, purporting to represent payment for catering services provided.  In fact, he knew that Altoon did not provide catering worth $5,600 for a Superbowl party; instead, Altoon cashed the CTE check and gave some of the money to Sollars for his personal use.

- Gov't Ex. 101: CTE check #1540 for $3,572.49, dated October 17, 2018, check for "Catering for Senior Citizen Delegate Event." (Gov't Ex. 102). Altoon provided approximately $900 of catering and gave **$2,672.49** to Sollars.

- Gov't Ex. 103: CTE check #1451 for $4,250, dated December 15, 2017, for "Employee Party Food." Altoon provided approximately $1,200 of catering and gave **$3,050** to Sollars.

Gov't Mem. at 50–51 (citations omitted, emphasis in original).

Finally, the Government points to two additional fraudulent checks through which Sollars received kickbacks.  The first relates to the Taylor Summer Festival.  Altoon testified that he provided the City with approximately $1,800 in catering for the Taylor Summer Festival, but he gave the City an inflated invoice in the amount of $3,425.70. 3/6/24 Hr'g Tr. at 48–49; 6/29/18 Invoice (Gov't. Ex. 105).  He further stated that the City paid him the full amount of the invoice and Altoon gave the difference of $1,625.70 to Sollars.  3/6/24 Hr'g Tr. at 48–49; 7/3/18 Check (Gov't Ex. 104).

The Government also cites to a CTE check in the amount of $4,575 dated January 3, 2019, for the State of the City event in 2019.  Gov't Mem. at 52 (citing 1/3/19 Check (Gov't Ex. 106)).  Altoon testified that Sollars directed him to issue a refund for the State of the City check.  3/6/24 Hr'g Tr. at 43–46.  Following Sollars's direction, Altoon issued a check payable to the CTE for $4,575, which reflected in the memo line, "Refund catering order 02/21/2019."  Id.; (Gov't Ex. 108).  Altoon backdated the money order to February 2019 to reflect the date the State of the City is normally held.  3/6/24 Hr'g Tr. at 45. Despite promising to do so, Sollars never paid him back.  Id. at 48.

Based on the above evidence, the Court finds that the Government has carried its burden of showing that Sollars received $36,522.20 as part of the fraud scheme.

### 5. Corporate Donations

The Government submits that Sollars fraudulently received $12,575 from vendors who were intending to pay for catering for City events.  Various companies would write checks to Dominick's Market to sponsor city events by paying for catering.  3/6/24 Hr'g Tr. at 29–31.  According to Altoon, unbeknownst to the vendors, Altoon provided no catering services for their payments.  Id. at 36–37.  Instead, he cashed the checks and gave the proceeds to Sollars.  Id. at 29–40.  The Government's memorandum provides a list of checks made payable to Dominick's Market for catering services that Altoon never provided, and which Altoon cashed and gave all the proceeds to Sollars in the form of cash or lottery tickets:

- Gov't Ex. 109: Check for **$1,775** from Al's Asphalt, dated October 31, 2017.

- Gov't Ex. 110: Check for **$2,000** from Al's Asphalt, dated November 21, 2017.

- Gov't Ex. 111: Check for **$500** from Pro Stump Grinding Co., dated December 4, 2017.

- Gov't Ex. 112: Check for **$500** from Vision Properties of Michigan, dated December 8, 2017, for "City of Taylor Xmas party sponsorship."

- Gov't Ex. 113: Check for **$1,000** from Ramin INC DBA Comfort Inn and Suites, dated December 15, 2017, for "Donation City of Taylor."

- Gov't Ex. 114: Check for **$500** from Vision Properties of Michigan, Inc., dated December 18, 2017, for "Donation-Xmas party sponsorship."

- Gov't Ex. 115: Check for **$1,000** from Pro Stump Grinding Co., dated October 19, 2018.

- Gov't Ex. 116: Check for **$2,000** from Al's Asphalt, dated October 19, 2018.

- Gov't Ex. 117: Check for **$500** from M&R Sekhon, dated October 20, 2018, for "Donation."

- Gov't Ex. 118: Check for **$1,000**, from Edra Development, Inc., dated October 23, 2018.

- Gov't Ex. 119: Check for **$500**, from Vision Properties of Michigan Inc., dated November 13, 2018, for "Sponsorship Xmas party IO & Pattah Development."

- Gov't Ex. 88: Check for **$1,300**, from Realty Transitions, dated October 6, 2017, for "Mayor's Lunch."

Gov't Mem. at 54–55 (citations omitted, emphasis original).

Sollars presented no evidence to contradict the testimony and exhibits presented by the Government on the issue of vendors providing checks to fund catering that was not provided. Therefore, the Court finds that the Government has met its burden to prove that Sollars received a total of $12,575 by fraudulently receiving the proceeds of checks from vendors who were intending to pay for catering for City events.

### C. Conclusions Regarding the Amount of Loss

As stated above, the preponderance of the evidence shows that the loss attributable to the bribery scheme (Count 1) totals $85,011.73. Accordingly, the Court finds that under USSG § 2C1.1(b)(2), an increase of six levels should be applied to this count because the value of the bribes was more than $40,000 and less than $95,000.

With respect to the amount of loss attributable to wire fraud (Count 19), the Court is satisfied that the Government proved by a preponderance of the evidence a loss amount of $70,362.98. The Court finds that, under USSG § 2B1.1(b)(1)(D), an increase of six

levels should be applied to this count because the loss amount was more than $40,000 and less than $95,000.

### D. Sollars's Amended Motion to Supplement

A little over one month after the parties filed their proposed findings of fact and conclusions of law, Sollars filed an amended motion to supplement his proposed findings of fact and conclusions of law regarding a portion of Awad's testimony. Sollars seeks to supplement the record regarding testimony that could be interpreted as suggesting that Victoria Shackelford, district court judge for the for Michigan's 23rd district court, was involved in unethical conduct with Sollars and Awad. <u>See</u> Am. Mot. to Suppl. Specifically, Awad testified about a spreadsheet he created that accounted for payments he made to the City. <u>See</u> 3/5/24 Hr'g Tr. at 49–50. Awad said that he created the spreadsheet because he was upset with what transpired with Sollars and the City:

> [O]bviously I was pretty upset with how everything played out, how I lost my properties, how, umm, they would coordinate stuff years in advance like Victoria Shackelford, I had to sell her house I was listing for 180 for 130 and then after she moved in, she wanted 15,000 dollars['] worth of work and then she gave me a check to buy the lot behind it and then I had to give her the check back.

<u>Id.</u> at 50.

After the hearing, but before the deadline to file proposed findings of fact, the parties received a letter from Judge Shackelford's counsel (the proposed supplement) responding to Awad's testimony. <u>See</u> Gov't. Resp. to Am. Mot. to Suppl. at 2 (Dkt. 141); <u>See</u> Am. Mot. to Suppl. at Ex. A. Although the parties did not submit this letter as an exhibit in their proposed findings of fact submissions, both Sollars and the Government addressed Awad's

testimony regarding Judge Shackelford.  In his proposed findings of fact, Sollars referred to Awad's testimony regarding Judge Shackelford and argued that such testimony showed that Awad "clearly and unambiguously perjured himself as it relates to services that he alleged he provided to a sitting District Court judge which is now the subject of additional review."  Def. Mem. at 2.  The Government's proposed findings of fact also addressed Awad's testimony.  It reported that it investigated Awad's statements regarding Judge Shackelford and "found no evidence of wrongdoing by Judge Shackelford."  Gov't Mem. at 38 n.3.  The Government further reported that it interviewed Awad after the hearing and he clarified that Sollars told him about an alleged plan to make Judge Shackelford chief judge, but the Government believes this conversation with Sollars occurred after Judge Shackelford purchased the house.  Id.

Sollars now asks the Court to supplement the record with Judge Shackelford's response.  He argues that the proposed supplement must be considered because it undermines the credibility of Awad, whom Sollars characterizes as the Government's "central witness."  Am. Mot. to Suppl. at 4–5.

The Court denies Sollars's motion to supplement to the record.  As an initial matter, as the Government points out, Resp. to Am. Mot. to Suppl. at 2, Sollars's motion is untimely.  Sollars received Judge Shackelford's response before he filed his proposed findings of fact and conclusions of law.  He could have moved to supplement the record with that response before filing his proposed findings of fact; he chose not to do so.

In addition, the Court's review of Sollars's proposed supplement does not undermine the Court's conclusions regarding the evidence of the amount of loss.  Judge

Shackelford's purchase of a home from Awad is not relevant to determining the amount of loss stemming from either the bribery or wire fraud schemes for which Sollars has pleaded guilty.  As the Court details above, Awad's testimony regarding the amount of loss stemming from Sollars's bribery and fraud schemes was corroborated with other evidence and witness testimony.  Even accepting Sollars's position—that Awad's testimony regarding Judge Shackelford is false—the Court is not required disregard the entirety of Awad's testimony.

Because the Court finds that the record before it is sufficient to make findings regarding the amount of loss, the Court denies Sollars's motion to supplement.

### III. CONCLUSION

For the foregoing reasons, the Court (i) determines that the amount of loss in this case require six levels to be added to Sollars's offense level for Count 1 and six levels to be added for Count 19 and (ii) denies Sollars's amended motion to supplement (Dkt. 140).

SO ORDERED.

Dated:  June 17, 2024                              s/Mark A. Goldsmith
      Detroit, Michigan                        MARK A. GOLDSMITH
                                            United States District Judge