UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

    Plaintiff,

v.

                                  No. 19-cr-20836

                                  Hon. Mark A. Goldsmith

D-1 Richard Sollars,

    Defendant.

---

### Government's Sentencing Memorandum

---

    To the casual observer, Richard Sollars appeared to be a dedicated public servant—serving as the elected mayor of the very community in which he was raised. But in truth, Sollars took advantage of his opportunity to serve the public to engage in a "pay-to-play" scheme to enrich himself and his family. Over several years, Sollars used his authority and influence as mayor of the City of Taylor to demand and accept over $84,000 in bribes. He accepted home renovations, gifts, cash, and other things of value from local businessman, Shady Awad, who sought to be awarded the development agreements for the City's Right of First Refusal (ROFR) program. But this wasn't enough. Sollars also took advantage of individuals and businesses who donated to his mayoral campaign. Sollars enlisted

1

another local business owner, who was also seeking to do business with the City, to steal over $70,000 in donations to his campaign fund.

For these corrupt and criminal acts, and in accordance with the terms of the plea agreement, the United States requests a sentence of 71 months to reflect the seriousness of the offense, provide just punishment, and to afford adequate deterrence to others who are tempted to betray the public's trust as Sollars did.

## I. Factual[1] and procedural history

### A. Sollars becomes mayor of the City of Taylor.

After being elected twice by the citizens of Taylor, Sollars served as mayor from 2013 to 2021. (PSR ¶ 10). As part of his election efforts, the defendant established the Committee to Elect Richard Sollars, Jr. (CTE) bank account to manage his campaign donations. (PSR ¶ 40).

### B. Taylor's Right of First Refusal program

In 2015, the City of Taylor created the ROFR program. (Baum Testimony: ECF No. 128, PageID.1244). Under this program, each year the City acquired tax-delinquent homes and would select developers to rehabilitate and eventually purchase the properties. (Plea Agreement: ECF No. 115, PageID.861). As mayor,

---

[1] The Court held a four-day evidentiary hearing related to the loss amount. The Government will not repeat in detail the factual history but incorporates its proposed findings of fact and conclusions of law (ECF No. 137) as well as the factual findings contained in the Court's opinion and order regarding the loss amount. (ECF No. 147).

Sollars had significant influence over who would be awarded properties under the ROFR program. (*Id.*, PageID.862; PSR ¶ 10). Sollars also signed the annual development agreements for the ROFR program on behalf of the City. (Awad: ECF No. 127, PageID.921).

### C. Realty Transition becomes the preferred developer under the ROFR program and the pay-to-play scheme begins.

Under the ROFR program, the City awarded developer Shady Awad's company, Realty Transition (RT), the development agreement each year from 2015 through 2018. (*Id.*, PageID.918, 926). Under the 2015 agreement, RT received 95 properties to develop. (*Id.*). During its first year, RT experienced a host of issues with the City including failed inspections and ordinance fees. (*Id.*, PageID.922). In an effort to address the problems RT was having with the City, Awad met with the mayor, Richard Sollars, in early 2016. (*Id.*, PageID.923-24).

Over time, Awad and Sollars developed a personal relationship that evolved into Sollars soliciting, and Awad providing, personal benefits to Sollars including, for example, paying for various contractors to perform work at Sollars's residence and lake house. (*Id.*, PageID.925-26). Under the ROFR program, the City selected which developer(s) would be awarded a development agreement each year. As Awad wanted to continue to be a preferred developer in the City's ROFR program, Sollars began soliciting bribes from Awad in the form of various home improvements and other items of value. In turn, Sollars agreed to exercise his

3

authority as mayor to increase the likelihood that Awad would receive the vast majority of the ROFR properties. (*Id.*). Under this bribery scheme, from July 2016 to February 2019, Sollars corruptly accepted free home renovations and other things of value from Awad, intending to be influenced and rewarded in connection with the ROFR program. (Plea Agreement: ECF No. 115, PageID.862). As a result, Awad received 104 of the 114 houses that were part of the ROFR program from 2016 to 2018. (*Id.*). The bribes that Sollars received in connection with Awad's participation in the ROFR program are detailed in the Court's opinion and order regarding the loss amount, and are set forth below. (Order: ECF No. 147, PageID.1852).

### D.  Sollars also misuses campaign funds.

Sollars also engaged in a scheme to defraud donors to his CTE account by falsely representing to the public that donations to his campaign would be used to support his election bid. (Plea Agreement: ECF No. 115, PageID.863). But in fact, Sollars knew that some of the donated funds would be used for his personal benefit. (*Id.*). The Court found that Sollars's fraud was committed in a number of ways as detailed in the Court's opinion and order regarding the loss amount, and as set forth below. (Order: ECF No. 147, PageID.1869).

**E. Sollars pleads guilty but contests loss amounts.**

On August 22, 2023, Sollars pleaded guilty to conspiracy to commit bribery concerning programs receiving federal funds (count one) and wire fraud (count nineteen) pursuant to a plea agreement. Despite his admissions of guilt regarding the conduct described above, Sollars reserved the right to contest the amounts of the bribes he accepted and the money he received through fraud. (Plea Agreement: ECF No. 115, PageID.868).

**F. Court determines loss amounts.**

Following a four-day evidentiary hearing, the Court determined the loss amounts attributable to Sollars for the bribery conspiracy and wire fraud scheme. (Order: ECF No. 147, PageID.1848).

The Court found that Sollars received the following bribes as part of the bribery conspiracy, totaling $84,537.55:

- Hardwood flooring, upstairs (residence): $2,750
- Painting (residence): $7,226.47
- Sliding door/extra screen (residence): $1,898
- Humidor: $1,804.27
- Hardwood flooring (lake house): $8,800
- Kitchen appliances (residence): $5,300
- Deck refinishing (lake house): $2,900
- Garage door (residence): $3,845
- Garage locker system (residence): $4,550
- Metal tool cabinets (residence): $1,242.77
- Hardwood flooring, basement (residence): $8,165.64
- Washer and dryer (residence): $3,678.65
- Vacuum cleaner: $634.94

- Hardwood flooring, main floor (residence): $2,500
- Front door (residence): $6,000
- Camera and warranty: $4,043.98
- Cash from credit card transactions, Dominick's Market: $19,682.01

(*Id.*, PageID.1850, 1852–1860; PSR ¶ 47).

The Court also found that the total amount of loss attributable to Sollars's wire fraud scheme and any relevant conduct is $70,362.99 based on the following:

- Cash donations to CTE: $10,000
- Lease pay-off for vehicle: $8,791.88
- Fraudulently withdrawn CTE funds: $2,473.91
- Fraudulent catering scheme: $36,522.19
- Fraudulent corporate donations: $12,575

(*Id.*, PageID.1869; PSR ¶ 47).

The Government agrees with the Court's findings as to the loss amounts for Counts 1 and 19.

### G. Despite his admissions and evidence to the contrary, Sollars now attempts to recharacterize the "bribes" he accepted as "gratuities."

In his objections to the Probation Department's Presentence Investigation Report, Sollars argued that with the exception of the garage door and the cash from credit card transactions, all of the items of value that the Court found were bribes, were actually gratuities. (PSR, p. A-2). Sollars's objections are inconsistent with his factual allocution in the plea agreement, the evidence that was introduced during the loss hearing, and the Court's findings regarding the benefits Awad provided Sollars as part of the bribery conspiracy.

6

First, as to the sliding door/extra screen, Sollars already agreed that he "received a sliding/door/screen from Awad *as part of a bribery scheme*." (Def. Proposed Findings of Fact: ECF No. 136, PageID.1696) (emphasis added). He now claims that this was a gratuity, not a bribe. (PSR, p. A-2). Given his prior stipulation, Sollars's new position is puzzling, if not disingenuous.

Second, Sollars previously claimed that the humidor (Def. Proposed Findings of Fact: ECF No. 136, PageID.1697), Dyson vacuum (*Id.*, PageID.1706), and camera (*Id.*, PageID.1708) were donations from Awad to the City, and not for Sollars personally. He now attempts to claim that these items were gratuities Awad provided him. (PSR, p. A-2). The inconsistency of Sollars's new assertions demonstrates that his arguments ring hollow. Sollars is attempting to recharacterize the facts to fit within the reach of the recent holding in *Snyder v. United States*, 144 S. Ct. 1947 (2024). But he cannot fit a square peg into a round hole.

All of the items of value that Sollars received from Awad were clearly bribes, and not gratuities. In *Snyder*, the Supreme Court held that 18 U.S.C. § 666, does not prohibit public officials from receiving payments made as a reward or token of appreciation for official action, that is, a gratuity. *Id.* at 1951. It only prohibits public officials from receiving bribes, which are payments made or agreed to before an official action in order to influence the public official with respect to that action. *Id.* The holding in *Snyder*, however, does not affect "[t]he 'retainer,' 'as

7

opportunities arise,' or 'stream of benefits' theory of bribery [which] occurs when a person bribes an individual or entity in exchange for a continuing course of conduct." *United States. v Roberson*, 998 F.3d 1237, 1245 (11th Cir. 2021). The inquiry following *Snyder* is why the payment is made, that is, whether it was made in satisfaction of some implicit or explicit agreement to secure some official action.

Here, there was an implicit agreement between Sollars and Awad. Indeed, Sollars admitted that he "agreed to exercise his authority to increase the likelihood that Awad received the vast majority of the properties in the ROFR program." (Plea Agreement: ECF No. 115, PageID.862). And, "[i]n return for and **in anticipation of exercising his authority** in this way, between July 2016 and February 2019, Sollars corruptly accepted from Awad improvements, renovations, and other things of value for Sollars's personal residence, office, and lake house." (*Id.*) (emphasis added). Despite these admissions, Sollars claims in his objections that "[t]here was no agreement or express understanding between Defendant and Shady Awad that an official act would be done for Awad in exchange for the services and gifts." (PSR, A-2). But "[a]s most bribery agreements will be oral and informal, the question is one of inferences taken from what the participants say, mean and do. . . ." *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013). And each home improvement project or gift from Awad does not need to be tied to a

8

specific official act, so long as Sollars understood that when the opportunity arose, he would take specific official actions on Awad's behalf. *Id.* at 614.

In addition to Sollars's admissions, the timing of the benefits Awad provided to Sollars strongly supports an inference that there was an implicit agreement or understanding between them that Awad would pay for what Sollars requested, and Sollars would exercise his authority to influence the ROFR process in Awad's favor. In June and July 2016, Awad provided Sollars with wood floors and a sliding patio door. (PSR ¶¶ 15, 16). On August 16, 2016, Sollars signed the development agreement awarding RT with 29 of the 34 ROFR properties. (PSR ¶ 17; Gov. Ex. 3). From September 2016 to July 2017, Awad provided Sollars with a humidor, exterior/interior painting, wood floors for his lake house, kitchen appliances, and promises to refinish the lake house deck. (PSR ¶¶ 16, 18–22). Awad explained that he purchased the humidor that Sollars requested so Sollars would stop taking away RT's properties and also to gain favor for the 2017 development agreement. (Awad: ECF No. 127, PageID.953-54). On July 18, 2017, Sollars signed the development agreement awarding RT with 38 of the 45 ROFR properties. (PSR ¶ 23, Gov. Ex. 4). From July 2017 through April 2018, Awad provided Sollars with deck refinishing, metal tool cabinets, custom lockers, cash for Sollars's trip to Vegas, wood floors for Sollars's basement, and a washer/dryer. (PSR ¶¶ 22, 24, 26–27, 30). With regard to the deck refinishing, Awad pressured

9

the contractor to finish Sollars's deck quickly, indicating that Awad would pay whatever it costs because his "relationship with Rick is worth $1 million[.]" (Gov. Ex. 36, p. 3). On July 17, 2018, Sollars signed the development agreement awarding RT with all 37 of the 37 ROFR properties. (PSR ¶ 32; Gov. Ex. 5). In a text on December 28, 2017, Awad referred to Sollars as "RT's silent partner." (PSR ¶ 29). From September 2018 through December 2018, Awad provided Sollars with a Dyson vacuum cleaner, new front doors, wood floors for the main floor of Sollars's home, and an expensive camera. (PSR ¶¶ 34, 36–37). The stream of benefits stopped in February 2019 when the FBI executed search warrants at Sollars's home and Taylor City Hall. But for the FBI raids, the 2019 development agreement would have been awarded, undoubtedly to RT, during the coming summer.

The pattern and timing of the benefits given by Awad corroborate that there was an implicit understanding that Sollars received these benefits with the intent to be influenced in connection with the coming year's award of ROFR properties. That Sollars was the one who repeatedly solicited and expected Awad to pay for the home improvements and gifts, all while the coming year's development agreement was under consideration, also establishes that these were bribes, not gratuities. Based on all of this, the Court also found that Sollars received the items

10

listed above as *bribes* as part of the *bribery* conspiracy. (Order: ECF No. 147, PageID.1852, 1869).

## II. Sentencing Guidelines

In the plea agreement, the parties recommended under Federal Rule of Criminal Procedure 11(c)(1)(B) that certain guidelines provisions apply:

As to Count 1
- USSG § 2C1.1(a)(1) – base offense level of 14 because defendant was a public official
- USSG § 2C1.1(b)(1) – an additional 2 levels because the offense involved more than one bribe
- USSG § 2C1.1(b)(3) – an additional 4 levels because the offense involved an elected public official

As to Count 19
- USSG § 2B1.1(a)(1) – base offense level of 7 for wire fraud
- USSG § 2B1.1(b)(9)(A) – an additional 2 levels because the offense involved a misrepresentation that the defendant was acting on behalf of a political organization.

The parties did not agree on the value of the bribes in Count 1 or the amount of fraud in Count 19. Following the evidentiary hearing, the Court found that the loss attributable to the bribery count is $85,011.73 which results in an additional 6 levels under USSG § 2C1.1(b)(2), and the loss attributable to the wire fraud count is $70,362.98 which results in an additional 6 levels under USSG 2B1.1(B)(1)(D). (Plea Agreement: ECF No. 147, PageID.1877). The parties did not anticipate that the counts of conviction would be grouped.

11

The Probation Department, however, grouped Counts 1 and 19 pursuant to USSG § 3D1.2(d). This resulted in a 10-level increase under §§ 2C1.1(b)(1)(F) and (b)(2). (PSR ¶ 58). The government is bound by the recommendations set forth in the plea agreement.

The Probation Department also applied a 2-level increase for the defendant's role in the offense under USSG § 3B1.1(c) and a 2-level increase for obstruction of justice under USSG § 3C1.1. The evidence that was introduced during the evidentiary hearing supports the application of these guideline provisions.

Based on the terms of the plea agreement, which did not anticipate grouping the counts of conviction, the Court's findings as to the loss amounts, the 4-level increase for the defendant's role and obstructive conduct, and the 3-level decrease for the defendant's acceptance of responsibility, the resulting guideline range is 70 to 87 months. The Probation Department, having grouped the counts of conviction, calculated a guideline range of 108 to 135 months. In accordance with the plea agreement, the government recommends a sentence of 71 months. (Plea Agreement: ECF No. 115, PageID.870).

### III.   Argument

Title 18, United States Code, Section 3553 details a number of considerations for the Court to take into account when imposing sentence. For the defendant, the most important factors are the need to reflect the seriousness of the offense, to

promote respect for the law, to provide just punishment, and to promote adequate deterrence. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), and (a)(2)(B).

### A. The defendant's crimes were extremely serious.

Sollars's breach of the public trust was a serious offense, deserving of a serious sentence. The defendant—a twice elected public official—abused the trust of Taylor residents and donors to his campaign. He also took advantage of businessmen who sought to do business in and with the City by demanding and expecting "pay" before they could "play." Such corruption and pay-to-play schemes slow (and even derail) government functions. The public suffers significant harm, including eroding faith in their government.

Moreover, Sollars's acceptance of bribes was not a crime resulting from a single decision or a momentary lapse of judgment. Instead, his corrupt demands from Shady Awad and Hadir Altoon were repeated over the course of almost 2½ years, and only stopped when he was caught in February 2019. In his dealings with Awad, Sollars's demands were brazen. Sollars acted as if he was somehow entitled to the personal enrichments by the mere fact that, as mayor, he "allowed" RT to do business with the City. If the work that Awad arranged to be performed for Sollars was not up to par or taking too long, Sollars would get angry. For example, when the first build of the custom garage locker system was not to Sollars's liking, he berated Awad saying that "[i]t looks like some shit cobbled up in woodshop class

13

at high school." (Gov. Ex. 43, p. 1). So, to make Sollars happy, Awad paid for a different carpenter to build a second set from scratch. Or, as another example, after Sollars had asked Awad to provide him with new wood flooring for his home and the contractor failed to show for a meeting about the project, Sollars angrily texted Awad, "Why in the fuck wouldn't he at least call someone so we're not waiting around? I get tired of the no-show and no call bullshit." (Gov. Ex. 74, p.1).

Sollars's anger made Awad feel pressured to do whatever it took to stay in Sollars's good graces, since Sollars had power over the ROFR program. In trying to get Paul Phillips, the wood floor contractor, to expeditiously finish work at Sollars's lakehouse, Awad texted Phillips that he would pay whatever it costs because his "relationship with Rick is worth $1 million" and there were consequences to pay if Sollars was upset. (Awad: ECF No. 127, PageID.975).

And Sollars showed that Awad could indeed face consequences related to the ROFR program if Awad failed to do what Sollars asked of him. For example, when Awad's credit card transactions at Dominick's Market had failed multiple times, Sollars got angry and threatened retribution. (Baum: ECF No 128, PageID.1273–75). After all, Sollars was awaiting the cash proceeds from the credit card transactions for his personal benefit. Sollars texted Baum, "Shady needs to call with his cc." (Gov. Ex. 84, p. 1). Baum followed up with Awad and reported back to Sollars that Awad "wants to do it in the am. He said he'll call Harry or send me

14

the info to process pmt." (*Id.*). Sollars responded, "Wtf. Is he on a fucking shoe string budget now?" (*Id.*). The next morning, Baum reported to Sollars that Awad assured him that he would call Harry to handle the credit card transaction. (*Id.*, p. 2). Sollars texted Baum that Awad "is about to get the fucking silent treatment from me in a few months…He is definitely getting split up this year…The cc issue remains unresolved." (*Id.*, p. 4). Getting "split up" meant that Sollars would penalize Awad by awarding ROFR properties to other developers. This meaning is corroborated by Baum, who responded, "Good because competition is what he [Awad] needs. He thinks he owns taylor. He is impossible to manage." (*Id.*).

While the prospect of not being awarded the ROFR properties in any given year was a serious threat to Awad's livelihood, the power this gave Sollars over Awad and his ability to essentially use Awad like a personal piggy bank was a joke to Sollars. For example, after Awad had purchased the cigar humidor that Sollars wanted, Solllars texted Awad to ask if it came with Cuban cigars. (Gov. Ex. 21). Knowing that Sollars's mention of the Cuban cigars would be perceived as a demand by Awad, Sollars then texted Jeff Baum, joking that "He [Awad] will be calling you soon in a panic. I just asked him when the Cuban cigars to fill it will be arriving." (*Id.*).

Another significant part of Sollars's criminal conduct was the fact that he enlisted a member of his own staff, Jeffrey Baum, and local small business owner

15

Hadir Altoon, in his wire fraud scheme. (PSR ¶ 42). Sollars directed Baum to sign blank checks from the CTE account and Awad to create fraudulent catering invoices so Sollars could steal the money that was donated to support his election bid. (*Id.*). Sollars's willingness to corrupt another city employee and a local business owner, all so Sollars could collect more cash, emphasizes the seriousness of his conduct.

The citizens who elected Sollars wanted a mayor who would work to make their lives better. Instead, Sollars chose to make his own life better by corruptly using his power as a government official to enhance his own lifestyle. A sentence of 71 months reflects the seriousness of Sollars's crimes.

### B. The sentence needs to promote respect for the law and just punishment for Sollars's serious crimes.

A significant sentence is needed to promote respect for the law and provide just punishment. Through his two elections, Sollars was supposed to represent the citizens of Taylor. Through his criminal conduct, Sollars betrayed those same citizens. He undermined the trust that citizens have in their elected leaders. By his own corrupt actions, Sollars likely increased cynicism by the electorate and a belief that all public officials are "on the take." For this, Sollars must face significant punishment.

As described by a federal judge in the prosecution of a corrupt mayor of Bridgeport, Connecticut:

16

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to thin of politics as "only for the insiders." Thus corruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, No. 3-01-CR-263, 2006 WL 1210984, at *5 (D. Conn., May 5, 2006), *aff'd*, 510 F.3d 134 (2d Cir. 2007). Sollars's actions here helped to shred that faith in democracy of the citizens of Taylor. They had the right to expect that Sollars would serve as their mayor to the best of his ability and in their best interests, rather than to undermine their trust in the government he was supposed to represent.

### C. The sentence must deter others, including local politicians, from breaching the public trust.

The Court should impose a significant prison sentence on Sollars in order to serve the important purpose of deterring other public officials in this district and beyond from engaging in similar misconduct. *See* 18 U.S.C. § 3553(a)(2)(B). General deterrence has its greatest impact in white-collar cases, like this one, because these crimes are committed in a more rational and calculated manner than sudden crimes of passion or opportunity. *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013). Indeed, "one of the primary objectives of sentencing elected officials convicted of bribery is to send a message to other public officials that bribery is a serious crime that carries with it a corresponding serious punishment."

17

*United States v. Morgan*, 635 Fed. App'x 423, 451–51 (10th Cir. 2015) (internal quotations omitted). In this case, Sollars's calculated decisions to accept home renovations, appliances, a humidor, a camera, cash, and other items of value took place repeatedly, and over the course of several years. Given his position as an elected official at the time of this criminal activity, Sollars should be punished appropriately. The example this Court makes through its sentence will send a clear message to other public officials in this district and beyond that corruption will not be tolerated.

### IV. Conclusion

Over the course of several years, Richard Sollars repeatedly demanded and accepted bribes using his position as the elected mayor of Taylor to satisfy his own greed and personal financial wants. He also fraudulently stole funds that had been donated to his campaign. Sollars has openly acknowledged that he accepted bribes and defrauded donors. Through a prison sentence of 71 months of imprisonment, this Court can hold Sollars accountable on behalf of all of the citizens of Taylor and this district.

*(signatures on following page)*

        Respectfully submitted,

        Dawn N. Ison
        United States Attorney


        *s/ Frances Lee Carlson*
        Frances Lee Carlson
        Assistant United States Attorney
        211 West Fort Street, Suite 2001
        Detroit, Michigan 48226-3211
        (313) 226-9696
        frances.carlson@usdoj.gov

        *s/ Robert A. Moran*
        Robert A. Moran
        Assistant United States Attorney
        211 West Fort Street, Suite 2001
        Detroit, Michigan 48226-3211
        (313) 226-9553
        robert.moran@usdoj.gov

Dated: September 11, 2024

## CERTIFICATE OF SERVICE

I certify that on Wednesday, September 11, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney of record.

*s/ Frances Lee Carlson*
Frances Lee Carlson
Assistant United States Attorney